[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 786 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 787 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 788 
 IN MANDAMUS ON OBJECTIONS TO THE MAGISTRATE'S DECISION
On August 6, 1998, R.T.G., Inc. ("RTG") and Charles and Rae Haught filed a complaint in this court against the State of Ohio, the Ohio Department of Natural Resources ("ODNR"), Donald C. Anderson, director of ODNR, the Division of *Page 789 
Mines and Reclamation ("division"), and Lisa Morris, chief of the division (hereinafter collectively referred to as "respondents"), seeking a writ of mandamus compelling the initiation of appropriation proceedings under R.C. Chapter 163. RTG and the Haughts (hereinafter collectively referred to as "relators") averred that the state took from them certain property rights without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 19, Article I of the Ohio Constitution.
By way of background, in 1988 the Village of Pleasant City, Ohio ("village") filed a petition with the division to designate eight hundred thirty-three acres of land in Guernsey County as being unsuitable for mining pursuant to R.C. 1513.073. Under R.C. 1513.073(A)(2)(c), the chief may designate a surface area unsuitable for all or certain types of coal mining operations if such operations could result in a substantial loss or reduction of long-range productivity of water supply or aquifers and aquifer recharge areas. The village asserted that continued mining of the area would damage the aquifer which was the sole source of water for the village.
RTG, a corporation formed for the purpose of coal mining, held coal and mining interests in certain parcels of the land at issue. The Haughts lived just north of the village and owned surface and coal rights in certain parcels of the land at issue.
On October 6, 1989, the chief of the division issued a decision designating a 2,000-foot radius around the village's wells as being unsuitable for mining. Such radius consisted of approximately two hundred seventy-five acres. The decision was designed to safeguard the village's water supply by protecting the cone of depression created by the village's pumping. Relators and the village appealed the chief's decision to the Reclamation Board of Review ("board"). The board modified the chief's designation by enlarging the area designated unsuitable for mining to approximately three hundred sixty-five acres.
The village appealed the board's decision to the Fifth District Court of Appeals. In Village of Pleasant City v. Div. of Reclamation (Apr. 7, 1992), Guernsey App. No. 91-CA-09, unreported, the court of appeals held that the board's order was contrary to law as it only protected the area of perceived present usage of the aquifer and aquifer recharge areas. The court held that the board should have also considered the impact mining could have on the long-range productivity of the aquifer and aquifer recharge areas. The court ordered the board to designate the entire eight hundred thirty-three acres unsuitable for mining.
The court of appeals' decision was appealed to the Supreme Court of Ohio. The Supreme Court held that the board must consider the effect that mining and reclamation could have on the long-range productivity of the aquifer and aquifer *Page 790 
recharge area. Pleasant City v. Ohio Dept. of Natl.Resources, Div. of Reclamation (1993), 67 Ohio St.3d 312, 320. The Supreme Court also concluded that the board, not the court of appeals, should determine what additional area may be designated as unsuitable for mining. Id. Hence, the Supreme Court remanded the matter to the board for such a determination.
On remand, the board determined that the entire eight hundred thirty-three acres was unsuitable for mining.
On September 21, 1994, relators filed a complaint in the Franklin County Court of Common Pleas seeking a writ of mandamus compelling the state to initiate appropriation proceedings under R.C. Chapter 163. The common pleas court dismissed the complaint, and relators appealed to this court. This court reversed the common pleas court's decision and remanded the matter for an evidentiary hearing and a determination as to whether or not a taking had occurred. State ex rel. R.T.G., Inc. v. State ofOhio (Mar. 31, 1997), Franklin App. No. 98APE05-662, unreported.
On remand to the common pleas court, relators voluntarily dismissed their complaint. On August 6, 1998, relators filed the instant action.
The case was referred to a magistrate to conduct appropriate proceedings. On March 10, 2000, the magistrate granted relators' motion to file an amended complaint adding as relators, James E. and Phyllis Rossiter and the Myron Fishel Scholarship Trust ("trust"). The Rossiters reside in Guernsey County, and Mr. Rossiter is the president, chief executive officer and principal shareholder of RTG. The Rossiters and the trust own certain coal rights within the designated area.
The parties submitted evidence and filed briefs and reply briefs. On April 13, 2000, respondents filed a motion for judgment on the pleadings asserting that relators' amended complaint was barred by the statute of limitations. On October 13, 2000, the magistrate granted relators' motion to file a second amended complaint in order to conform to the evidence.
On October 30, 2000, the magistrate issued a magistrate's decision containing findings of fact and conclusions of law. The magistrate denied respondents' motion for judgment on the pleadings. The magistrate concluded that no taking had occurred with regard to surface rights held by the Haughts, as the Haughts could put the land to uses other than coal mining. The magistrate concluded that a "taking" had occurred with regard to certain coal mining rights held by RTG and the Rossiters. (Magistrate's decision at 29.) However, the magistrate concluded that further mining in the area would constitute a nuisance and, therefore, the state was not obligated to compensate RTG and the Rossiters. *Page 791 
Accordingly, the magistrate concluded that this court should deny the requested writ of mandamus.
Both relators and respondents have filed objections to the magistrate's decision. Relators set forth the following objections:
 1. The Magistrate erred as a matter of law in holding that coal owners who also own surface estates cannot state a takings claim for the uncompensated government taking of their coal property and mining rights.
 2. The Magistrate Misconstrued The Lucas Nuisance Exception As A Matter of Law.
 3. The Magistrate's finding that coal mining could not have been conducted in Parcels C, D, and E without causing a common law nuisance is against the manifest weight of the evidence.
 4. The Magistrate failed to consider the evidence that surface mining could be regulated and conducted in a manner which would not disturb the village's water production.
Respondents have filed the following objections to the magistrate's decision:
 1. THE LAW REGARDING STATUTES OF LIMITATIONS WARRANTED THE GRANT OF THE STATE'S MOTION FOR JUDGMENT ON THE PLEADINGS.
 2. A MANDAMUS ACTION CANNOT BE MAINTAINED BY A PETITIONER TO COMPEL THE STATE TO APPROPRIATE PROPERTY INTERESTS NO LONGER OWNED BY PETITIONER.
 3. THE LANDS UNSUITABLE FOR MINING DESIGNATION DID NOT ENCOMPASS THE ENTIRETY OF THE RELATOR HAUGHT PROPERTY OR THE ENTIRETY OF ANY LEASEHOLD INTEREST UNDER THE HAUGHT PROPERTY.
In order to be entitled to a writ of mandamus, a relator must establish a clear legal right to the relief requested, a clear legal duty to perform the requested act on the part of the respondent, and no plain and adequate remedy at law. State ex rel. Haylett v. Ohio Bur. of Workers'Comp. (1999), 87 Ohio St.3d 325, 334. Mandamus is a proper method by which to compel appropriation proceedings. See State ex rel. Levin v.Sheffield Lake (1994), 70 Ohio St.3d 104, 109.
We address respondents' first and second objections first. In their first objection, respondents contend the magistrate erred in failing to grant their motion for judgment on the pleadings on statute of limitations grounds. The magistrate denied the motion, finding a twenty-one year statute of limitations applied in an action to compel commencement of appropriation proceedings. Respondents assert that the action herein is subject to either the two-year statute *Page 792 
of limitations contained in R.C. 2305.10 or the four-year statute of limitations contained in R.C. 2305.09(D).
Mandamus actions are subject to statutes of limitations. See State exrel. Gingrich v. Fairfield City Bd. of Edn. (1985), 18 Ohio St.3d 244. In determining which statute of limitations applied to the particular mandamus action in Gingrich, the Supreme Court looked for the most analogous statute of limitations. Id. at 244-245. We conclude that under the facts in the case at bar, the most analogous statute of limitations is the four-year statute of limitations found in R.C. 2305.09(D).
The magistrate based her application of a twenty-one year statute of limitations on Fries v. The Wheeling Lake Erie Railway Co. (1897),56 Ohio St. 135. The Supreme Court in Fries held:
 The proceeding to compel an appropriation is not barred by the lapse of less than twenty-one years from the time of such occupancy by the company. [Id. at paragraph three of the syllabus.]
The syllabus language, at first blush, appears to be on point. However, the "appropriation" action in Fries was not the same type of appropriation action contemplated in the case at bar. Fries involved two private entities and facts sounding in adverse possession. Further, Fries
involved old statutes which permitted railroad companies to appropriate private property and the property owners to file suit to compel appropriation. Such statutes also permitted the property owners to proceed against railroad companies as in all other cases involving the unlawful entry upon lands. Id. at 139. Citing earlier cases addressing the same statutes, the Supreme Court applied a twenty-one year statute of limitations to such "appropriation" actions. Id. at 145.
Given this, it was error to apply a twenty-one year statute of limitations to the case at bar based on Fries. We note that courts have cited Fries in support of application of a twenty-one year statute of limitations to mandamus cases involving governmental takings. SeeConsolidated Rail Corp. v. Gahanna (May 16, 1996), Franklin App. No. 95APE12-1578, unreported; Hardale Investment Co. v. State of Ohio, Dept.of Natl. Resources (Apr. 14, 2000), Belmont App. No. 98-BA-40, unreported, discretionary appeal not allowed in (2000), 90 Ohio St.3d 1403. To the extent, if at all, these cases rely on Fries as direct authority for applying a twenty-one year statute of limitations to takings cases in general, we believe they are wrong. Again, Fries was not a takings case such as the takings cases in Consolidated Rail Co., Hardale and the case herein. In addition, the facts in Consolidated Rail Co. are distinguishable from those in the case at bar. *Page 793 
In Consolidated Rail Co., the city actually had physical possession of the property in question. Hence, it could be said that in that case the most analogous statute of limitations was the adverse possession statute of limitations. Such statute of limitations, R.C. 2305.04, states:
 An action to recover the title to or possession of real property shall be brought within twenty-one years after the cause of action accrued * * *.
The facts in the case at bar are distinguishable. The case herein is a regulatory takings case. The state does not have nor does it desire actual physical possession of the property at issue. The state may adversely possess property. See State ex rel. A.A.A. Investments v.Columbus (1985) 17 Ohio St.3d 151, 152. However, this is not what occurred herein. Rather, the state has imposed a regulation on the property that limits the relators' use of the property and for which the relators want, in essence, damages or compensation. Hence, R.C. 2305.04, the adverse possession statute of limitations, does not apply.
Instead, we believe that the most analogous statute of limitations is R.C. 2305.09(D), which states:
 An action for any of the following causes shall be brought within four years after the cause thereof accrued:
* * *
 (D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12, 2305.14
and 1304.35 of the Revised Code.
Applying the four-year statute of limitations to the case at bar, we find relators' case was timely brought. As indicated above, the board's final decision was filed on June 16, 1994. Therefore, relators had until June 16, 1998 to initiate their claim. On September 21, 1994, RTG and the Haughts filed a complaint in the Franklin County Court of Common Pleas seeking a writ of mandamus compelling the state to initiate appropriation proceedings under R.C. Chapter 163. They voluntarily dismissed the complaint on August 14, 1998, after the four-year statute of limitations had run. However, they filed the present action within one year of the dismissal of the complaint, on August 8, 1998. Hence, the savings statute, R.C. 2305.19 applies, and relators have timely brought this action.
Therefore, albeit for different reasons, the magistrate did not err in denying respondents' motion for judgment on the pleadings. Accordingly, we overrule respondents' first objection.
In their second objection, respondents contend that the Haughts cannot maintain this action as to certain property they no longer own. In 1981, *Page 794 
the Haughts acquired seventy-two acres in the designated area. The Haughts leased the right to mine the coal in this area to RTG. After the state declared the land unsuitable for mining, the Haughts sold this particular property.
While the Haughts no longer own this particular property, they were the owners at the time of the alleged taking. Since compensation is due at the time of the taking, the owner at that time, not the owner at an earlier or later date, receives the payment. United States v. Dow
(1958), 357 U.S. 17, 20-21, 78 S.Ct. 1039, 1043-1044, citing Danforth v.United States (1939), 308 U.S. 271, 284, 60 S.Ct. 231, 236. See, also,Yaist v. United States (1981), 656 F.2d 616, 623 (compensation can be paid only to the person who owns or has an interest in the property at the time it is taken). Therefore, the Haughts can properly maintain this action as to the property they subsequently sold.
Accordingly, respondents' second objection is overruled.
In their third objection, respondents contend the magistrate's decision was erroneous to the extent it concluded there was a taking of certain property that was not subject to the board's designation. The magistrate concluded that a taking had occurred with respect to certain parcels of land leased by the Haughts and the trust to RTG and the Rossiters. The magistrate found that as to this property, RTG and the Rossiters held only the right to mine and, therefore, the designation of such property as unsuitable for mining constituted a taking.
Respondents assert that portions of the land in these parcels are not subject to the designation because such portions are located at or above eight hundred twenty feet in elevation. Indeed, the board's June 16, 1994 decision designated as unsuitable for mining all land in Sections 7 and 8, Valley Township, Guernsey County that lie below the eight hundred twenty foot contour elevation. The magistrate's decision concluded a taking had occurred only as the land designated by the board as being unsuitable for mining. The magistrate's decision states that "* * * by declaring this land unsuitable for mining, the state has effected a taking * * *." (Magistrate's decision at 29; emphasis added.)
Hence, the magistrate's conclusion that a taking had occurred as to certain property applied only to the land designated as unsuitable for mining — that land lying below the eight hundred twenty foot contour elevation. The magistrate did not find a taking as to the property above such elevation.
As there is no error in the magistrate's decision in this regard, respondents' third objection is overruled.
We now turn to relators' objections. In their first objection, relators contend the magistrate erred in concluding that the owners of coal rights who also had surface rights could not state a takings claim. The magistrate stated that *Page 795 
the test for whether or not a regulatory taking had occurred included a determination as to whether the taking deprived the owner of all economically viable use of the property. (Magistrate's decision at 25-26.) The magistrate concluded that the holders of surface rights in the property at issue had not suffered a taking because, as surface owners, they could put the property to uses other than coal mining. Id. at 28-29. Relators assert that this was error as a matter of law. For the reasons that follow, we find that in designating the property unsuitable for mining, the state did not effect a taking with regard to that property in which relators own surface rights.
The Fifth Amendment to the United States Constitution guarantees that private property shall not be taken for public use without just compensation. Agins v. Tiburon (1980), 447 U.S. 255, 260,100 S.Ct. 2138, 2141. In takings cases, the United States Supreme Court has been unable to develop any set formula for determining when the government has to compensate a property owner. Penn Central Transportation Co. v. NewYork City (1978), 438 U.S. 104, 124, 98 S.Ct. 2646, 2659. Whether a particular restriction will be invalid by a government's failure to compensate depends largely upon the particular circumstances in each case, and the taking question is examined by engaging in essentially ad hoc, factual inquiries. Id., 438 U.S. at 104; Eastern Enterprises v.Apfel (1998), 524 U.S. 498, 523, 118 S.Ct. 2131, 2146.
The Supreme Court has identified several factors that have particular significance in such ad hoc inquiries such as the economic impact of the regulation, the regulation's interference with reasonable investment backed expectations, and the character of the governmental action. KaiserAetna v. United States (1979), 444 U.S. 164, 175, 100 S.Ct. 383, 390;Eastern Enterprises, 524 U.S. at 523-524. The Supreme Court has sustained land-use regulations which were reasonably related to the promotion of the general welfare, and such decisions uniformly rejected the proposition that diminution in property value alone establishes a taking. See Penn Central Transportation Co., 438 U.S. at 131. Instead, such cases resolved the taking issue by focusing on the uses the regulations permitted. Id.
Where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking because the aggregate must be viewed in its entirety. Keystone Bituminous CoalAssoc. v. DeBenedictis (1987), 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, quoting Andrus v. Allard (1979), 444 U.S. 51, 65-66, 100 S.Ct. 318,326-327. In addition, the mere fact that a regulation deprives the property owner of the most profitable use of his or her property is not necessarily enough *Page 796 
to establish the owner's right to compensation. UnitedStates v. Central Eureka Mining Co. (1958), 357 U.S. 155, 168,78 S.Ct. 1097, 1104.
Applying the above principles to the facts presented in the case at bar, we determine that as to the owners of surface as well as mining rights, there has been no taking.
We first examine the regulation. A use restriction may constitute a taking if it is not reasonably necessary to effectuate a substantial public purpose. Penn Central Transportation Co., 438 U.S. at 127. As indicated above, R.C. 1513.073(A)(2) permits the designation of a surface area unsuitable for coal mining operations if such operations could result in a substantial loss or reduction of long-range productivity of water supply or aquifers and aquifer recharge areas. The regulation at issue here addresses the legitimate and substantial state interest in protecting water sources for communities, and relators do not dispute this. The aquifer at issue is the sole source of water for the village. Certainly, prohibiting mining that can and does impact such water source will substantially advance the state's interest.
As to the nature and extent of the interference with relators' rights, relators focus on those parcels in which RTG owns both surface and coal rights. Relators contend that RTG's sole purpose in acquiring such property was to engage in mining thereon and, therefore, a total taking has occurred. However, the regulation here has destroyed only one strand in RTG's bundle of rights it holds in such property. While coal mining may be the most profitable use of such property, the prohibition of such activity does not in and of itself constitute a taking. The case law requires us to look at the rights RTG holds in their entirety, which include the surface rights.
As to the mining rights in such property, we note that RTG has already conducted significant mining of such property. The evidence shows that RTG made considerable investments towards the mining of such areas. However, of the approximately one hundred eight acres for which RTG received permits to mine, seventy acres have already been mined. Therefore, the interference with RTG's mining rights in such areas is not as significant as it could have been.
Further, the evidence shows that the area in question includes at least two home sites, a house and a barn, woodland, pastureland and tillable land. Again, RTG may not have purchased the rights to such land with such uses in mind. However, RTG has these rights nonetheless, and such must be considered in our determination. As for the property to which the Haughts own surface rights, such property consists of pastureland and woodlands. The Haughts have their *Page 797 
residence on such land as well as oil and gas wells. The Haughts have raised cows, cut timber and grown hay on their land.
Considering all of the circumstances and factors, we find there has been no taking with regard to the property to which relators own surface rights. The state's interest here is both legitimate and substantial. As stated by the United States Supreme Court, long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause did not transform this principle into one that requires compensation whenever the state asserts its power to enforce it. Keystone Bituminous Coal Assoc., 480 U.S. at 491-492. Relators have other uses to which they can put the property, and RTG has already significantly mined the area. Given all of the above, we find no taking has occurred with regard to this property.
Accordingly, relators' first objection is overruled.
Relators' second, third and fourth objections will be addressed together. Relators contend, in essence, that the magistrate erred in concluding no taking had occurred with regard to coal rights on the basis that mining in the area would constitute a nuisance. Specifically, relators contend that the magistrate erroneously applied the standard set forth in Lucas v. South Carolina Coastal Council (1992), 505 U.S. 1003,112 S.Ct. 2886, the magistrate's finding that further coal mining in the area would constitute a nuisance was against the manifest weight of the evidence, and the magistrate failed to consider evidence that mining could be regulated and conducted so as to not disturb the village's water production.
Citing Lucas, the magistrate stated that a regulation that deprives an owner of all economically beneficial use of land will constitute a taking unless the state can identify background principles of nuisance and property law that prohibit the owner's intended use of the property. (Magistrate's decision at 23-24.) The magistrate concluded that RTG and/or the Rossiters had only mining rights in certain parcels within the designated area; therefore, the regulation deprived them of all economically viable use of such property. Id. at 29. However, the magistrate found that further mining would constitute a nuisance. Id. at 30. Accordingly, the magistrate concluded that the state was not obligated to compensate relators. Id. at 31.
First, we agree with the magistrate's conclusion that as to certain parcels, RTG and/or the Rossitors owned only an interest in coal rights. Therefore, when the area was designated unsuitable for mining, RTG and/or the Rossiters were denied all use of such property right. In Lucas, the United States Supreme Court set forth a standard to be applied in cases where a regulation denies a property *Page 798 
owner of all economically beneficial use of his or her land. As a general matter, the Supreme Court stated that while property may be regulated to a certain extent, if such regulation goes too far it will be recognized as a taking. Lucas,505 U.S. at 1014, quoting Pennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393,415, 43 S.Ct. 158, 160. As to when a regulation goes "too far," the Supreme Court noted that they had eschewed any set formula and preferred to engage in ad hoc, factual inquiries. Lucas, 505 U.S. at 1015.
However, Justice Scalia, writing for the majority, stated that the Court had recognized two distinct categories of regulatory action that are compensable without case-specific inquiry into the public interest advanced in support of the restraint. Id. Such categories are regulations that compel the property owner to suffer a physical "invasion" of his or her property and regulations that deny all economically beneficial or productive use of land. Id. Justice Scalia went on to state:
 Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. Id. at 1027.
He went on to explain that regulations that prohibit all economically beneficial use of land cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the state's law of property and nuisance already place upon land ownership. Id. at 1029. A law with such an effect must do no more than duplicate the result that could have been achieved in the courts by adjacent landowners under the state's law of private nuisance or by the state under its complementary power to abate nuisances that affect the public generally. Id. In other words, the use was always unlawful, and when a regulation goes beyond what the relevant background principles would dictate, compensation must be paid. Id. at 1030.
The total taking inquiry will ordinarily entail an analysis of the degree of harm to public lands and resources posed by the claimant's proposed activities, the social value of the claimant's activities and their suitability to the locality in question, and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government. Id. at 1030-1031. The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common law prohibition, although changed circumstances or new knowledge *Page 799 
may make what was previously permissible no longer so. Id. at 1031.
The Supreme Court emphasized that in order to win its case, South Carolina had to do more than proffer the legislature's declaration that the uses Mr. Lucas desired were inconsistent with the public interest or that the uses would violate a common law maxim such as sic utere tuo utalienum non laedas (use your own property in such a manner as not to injure that of another); it had to identify background principles of nuisance and property law that would prohibit the uses the owner now intends in the circumstances in which the property is presently found.Id.
With the above in mind, we must now look to this state's nuisance and property law in order to determine whether RTG's proposed coal mining would be prohibited by such common law principles. In Taylor v.Cincinnati (1944), 143 Ohio St. 426, paragraphs two and three of the syllabus, the Supreme Court of Ohio held:
 2. Absolute nuisance, for which strict liability or liability without fault is imposed by law, may be defined as a distinct civil wrong arising or resulting from the invasion of a legally protected interest, and consisting of an unreasonable interference with the use and enjoyment of the property of another; the doing of anything or the permitting of anything under one's control or direction to be done without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights; the unlawfully doing of anything or the permitting of anything under one's control or direction to be done, which results in injury to another; or the collecting and keeping on one's premises anything inherently dangerous or likely to do mischief, if it escapes, which, escaping, injures another in the enjoyment of his legal rights.
 3. As distinguished from absolute nuisance, a qualified nuisance or nuisance dependent upon negligence consists of anything lawfully but so negligently or carelessly done or permitted as to create a potential and unreasonable risk of harm, which, in due course, results in injury to another.
The Supreme Court, in essence, reiterated its holdings in Taylor inMetzger v. The Pennsylvania, Ohio Detroit Rd. Co. (1946),146 Ohio St. 406, paragraphs one and two of the syllabus:
 1. An absolute nuisance, or nuisance per se, consists of either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault. *Page 800 
 2. A qualified nuisance, or nuisance dependent upon negligence, consists of an act lawfully but so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another. * * *
An absolute or qualified nuisance can be either a public or private nuisance. A public nuisance covers the invasion of rights common to all members of the public. Brown v. Scioto Cty. Bd. of Commrs. (1993),87 Ohio App.3d 704, 712. In addition to common law public nuisance, Ohio has adopted statutes and administrative regulations that define certain conduct as being public nuisances. Id. Conversely, a private nuisance threatens only one person or a few persons. Taylor at 442. A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. Brown at 712.
The activity proposed here, coal mining, would clearly fall under a public nuisance theory as it allegedly would adversely affect the village as a whole. Further, such activity should be analyzed under a qualified nuisance theory. An absolute nuisance or nuisance per se is based upon either intentional conduct or abnormally dangerous conditions, and no matter how careful one is such activities are inherently injurious and cannot be conducted without damaging another's property or rights. Id. at 713. Clearly, the coal mining proposed here is not an inherently dangerous activity nor is RTG proposing to engage in intentionally injurious activities such that strict liability would apply. We note that it has been held that strict liability is not appropriate where the public policy of the state allows a business to engage in certain activities subject to limitations. State ex rel. Schoener v. HamiltonCty. Bd. of Commrs. (1992), 84 Ohio App.3d 794, 800. Here, RTG obtained permits to mine in the area at issue and, indeed, mined in the area. Hence, the proposed activity here would not fall under an absolute nuisance theory. Instead, we apply a qualified nuisance standard.
A civil action based upon the maintenance of a qualified nuisance is essentially an action in tort for the negligent maintenance of a condition, which, of itself, creates an unreasonable risk of harm, ultimately resulting in injury. Allen Freight Lines, Inc. v. Consol. RailCorp. (1992), 64 Ohio St.3d 274, 275. The dangerous condition constitutes the nuisance, and the action is predicated upon carelessly or negligently allowing such condition to exist. Id. Negligence must be averred and proven to warrant a recovery. Id. at 276. *Page 801 
Applying the above law to the facts in the case at bar, we conclude that relators' proposed activity, coal mining, would not have constituted a qualified public nuisance.
The activity proposed here is coal mining. Coal mining, in and of itself, is not a nuisance. Indeed, it is a lawful activity subject to certain permitting requirements. RTG obtained permits to mine near and within the area that was later designated unsuitable for mining. At the time such permits were approved, the division was aware of the possible effects of mining on the aquifer at issue. Indeed, in 1982 the village filed a petition to designate the area within a two-mile radius of its well field as being unsuitable for mining. This petition was denied.
In April 1984, RVG (RTG's predecessor) applied for a permit to mine in the area. During the permitting process, monitoring wells were installed, and the Ohio Division of Water aided in monitoring such wells. On May 20, 1986, RVG was issued a mining and reclamation permit, and RVG's mining operations in the area began. Such approval was upheld by the board based upon a finding that there should be no adverse impact on the village's well field. RTG was subsequently granted two extensions of such permit.
Hence, RVG/RTG has acted in all regards in a reasonable manner. It followed the permitting process and with the aid of the Division of Water, monitored the effects of its mining on the village's water supply. RTG's activities were sanctioned by the state. It is immaterial that the state has now properly designated the area unsuitable for mining and, as such, mining is no longer permitted in the area. We are mindful that such designation was based upon a finding that mining in the area could have and has had an effect on the village's water supply. However, such determination does not in and of itself automatically transform RTG's proposed mining operations into a nuisance. Put another way, the appropriateness of the state's action under R.C. 1513.073 is not a linchpin to a nuisance finding.
We reiterate what was stated in Lucas — when a regulation deprives an owner of all economically viable use of his or her property, a case-by-case inquiry into the public interest advanced by such regulation does not occur. Lucas, 505 U.S. at 1015. The fact that the state could properly designate the lands unsuitable for mining under its police powers does not affect our analysis. Rather, what must be shown is that the proscribed use was not part of RTG's title to begin with. Id. at 1027. The state simply cannot make such a showing in the case at bar. Again, a nuisance determination will involve an analysis of the degree of harm to public lands and resources posed by the claimant's proposed activities, the social value of the claimant's activities and their suitability to the locality in question, and the relative ease with which the alleged harm can be *Page 802 
avoided through measures taken by the claimant and the government. Id. at 1030-1031.
Relators assert that the regulation at issue, R.C. 1513.073(A)(2)(c), allowed the unsuitable for mining designation based on possible loss or reduction of long-range productivity of water supply or aquifers and aquifer recharge areas. Relators assert that in order to fall under theLucas nuisance exception, the state has to show that the grounds for prohibiting mining under the statute would also qualify as clear and convincing evidence supporting a common law injunction based on nuisance. Relators further contend that possible impact to future productivity of an aquifer does not add up to a nuisance finding clear and convincing evidence of an impending harm. For the most part, we agree with relators' assertions.
We note that there was evidence to support a finding that mining in the area had already impacted the water level in certain of the monitoring wells. However, this is but one factor in the nuisance analysis. More importantly, the evidence did not show that mining would have the kind of impact on the village's water supply that would constitute an impending, serious harm. In order to justify the granting of equitable relief against a nuisance, there must be actual, real, material, substantial, serious and permanent or potentially permanent injury or an appreciable interference with the ordinary enjoyment of land. State ex rel. Chalfinv. Glick (1960), 113 Ohio App. 23, 27. The evidence simply does not show such an injury or threatened injury. While the actual and potential injury to the village's water supply/aquifer supports the designation under R.C. 1513.073(A)(2)(c), it does not support a nuisance finding. Further, there was evidence that RTG's mining operations could be monitored so that any impact on the village's water supply could be detected and, if necessary, such operations could be discontinued.
Given all of the above, we conclude that RTG's proposed mining operations in those areas in which it and/or the Rossitors owned only mining rights would not constitute a nuisance. In other words, the regulation at issue here — the prohibition of mining operations due to a finding that such operations could result in a substantial loss or reduction of long-range productivity of water supply or aquifers and aquifer recharge areas did not inhere in RTG's and/or the Rossiter's title to the property interests at issue. Therefore, a taking has occurred with regard to such property interest(s), and the affected relators must be compensated.
Accordingly, relators' second, third and fourth objections are sustained to the extent discussed above. Relators have established their right to a writ of mandamus compelling the state to commence appropriation proceedings as to the *Page 803 
property in which RTG and/or the Rossiters own only mining rights. Hence, we grant relators' requested writ of mandamus.
In summary, respondents' objections are overruled. Relators' first objection is overruled, and relators' second, third and fourth objections are sustained. We hereby issue a writ of mandamus ordering the state to commence appropriation proceedings pursuant to R.C. Chapter 163 as to the property in which RTG and/or the Rossiters own only mining rights.
 ___________________ TYACK, J.
PETREE and BROWN, JJ., concur.