[This decision has been published in *Ohio Official Reports* at 98 Ohio St.3d 1.]

THE STATE EX REL. R.T.G., INC. ET AL., APPELLEES AND CROSS-APPELLANTS,

*v*. THE STATE OF OHIO ET AL., APPELLANTS AND CROSS-APPELLEES.

THE STATE EX REL. R.T.G., INC., APPELLANTS, *v*. THE STATE OF OHIO ET. AL.,

APPELLEES.

[Cite as *State ex rel. R.T.G., Inc. v. State*, 2002-Ohio-6716.]

*Mineral rights—Regulatory takings—Six-year limitation period of R.C.*
*2305.07 applicable to mandamus action to compel state to begin*
*appropriation proceedings—In determining the relevant parcel for*
*a takings analysis, pursuant to the Takings Clause of the Ohio*
*Constitution, coal rights are severable and may be considered as a*
*separate property interest, when.*

(Nos. 2001-0748 and 2001-0976—Submitted March 27, 2002—Decided

December 18, 2002.)

APPEALS AND CROSS-APPEAL from the Court of Appeals for Franklin County, No.

98AP-1015, 141 Ohio App.3d 784, 2001-Ohio-4267, 753 N.E.2d 869.

_____

SYLLABUS OF THE COURT

In determining the relevant parcel for a takings analysis, pursuant to the Takings
Clause of the Ohio Constitution, Section 19, Article I, coal rights are
severable and may be considered as a separate property interest if the
property owner's intent was to purchase the property solely for the purpose
of mining the coal. (*Moore v. Indian Camp Coal Co.* [1907], 75 Ohio St.
493, 80 N.E. 6, applied.)

_____

**LUNDBERG STRATTON, J**.

## I. Introduction

**{¶1}** This is a regulatory-takings case. Regulatory-takings issues are complex and difficult and have defied attempts to provide a simple solution. Even the United States Supreme Court "quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co. v. New York City* (1978), 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.

**{¶2}** R.T.G., Inc. ("RTG"), is a coal-mining company that began surface-mining land located in eastern Ohio in the 1980s. This property consisted of tracts of land that RTG owned in fee and tracts of land in which RTG owned or leased coal rights only. Ultimately, the state of Ohio determined that RTG's surface mining of this property could adversely affect the aquifer that supplied water wells for the village of Pleasant City. Therefore, pursuant to R.C. 1513.073, the state designated 833 acres of property in Guernsey County as unsuitable for mining ("UFM"), including a substantial portion of RTG's property.

**{¶3}** RTG filed a complaint seeking a writ of mandamus to compel the state to appropriate the coal that the state's UFM designation prevented RTG from mining. The appellate court held that imposition of the UFM regulation resulted in a taking of the coal that lies under the tracts of land that are located within the UFM-designated area and in which RTG owned coal rights only. However, the court held that the UFM designation did not result in a taking of the coal that lies under the tracts of land that RTG owned in fee. We reverse the judgment of the court of appeals in part and hold that the UFM regulation resulted in a taking of RTG's coal that lies under the tracts of land in which RTG owned only coal rights and that are located within the UFM-designated area, as well as the coal rights that lie under the

2

tracts of land that RTG owned in fee and that are located in the UFM-designated area.

{¶4} In a separate entry, the court of appeals denied RTG's motion for attorney fees and costs. We also reverse this judgment and hold that RTG is due reasonable attorney fees and costs.

## II. RTG's Efforts to Mine Its Property

{¶5} James Rossiter is the president, CEO, and controlling shareholder of RTG. RTG is a coal-mining company. In 1982, RTG began investigating the viability of surface-mining coal in Valley Township, Guernsey County, just to the northwest of the village. RTG conducted extensive test drilling, which indicated the presence of high quality coal in this area. Consequently, RTG began acquiring property in this area for the purpose of mining coal. In all, RTG acquired approximately 500 acres of property through purchases in fee or purchases or leases of coal rights in sections 5, 7, and 8 of Valley Township. Approximately 200 acres of this property consisted of several tracts of property that RTG owned in fee (surface and coal rights). Approximately 300 acres consisted of several tracts of property in which RTG leased or owned coal rights only.[1] Rossiter testified that RTG spent over $250,000 to acquire these property rights, to test-drill, and to prepare the mine permit applications.

{¶6} In 1984, RTG filed an application to mine 21.8 acres of the property that it had acquired. Because the area subject to the permit application was within three-quarters of a mile of a well field that provided water to the village, the Ohio Department of Natural Resources, Division of Reclamation ("DOR"), required

---

1. The record is unclear regarding the exact amount of RTG's property that is held in fee versus the amount of coal rights that RTG owns apart from ownership of the surface. The record is also unclear regarding the exact amount of RTG's property that is located outside the regulated area versus the exact amount of its property that is located inside the regulated area. Accordingly, while the acreages that we cite throughout this opinion are substantially supported by the record and are sufficiently accurate to support the analysis that we perform, they are nonetheless estimates.

RTG to install monitoring wells between the area to be mined and the village's water wells to determine whether that mining would interfere with the village's water supply. A pump test indicated that the monitoring wells were in a different aquifer from the village's wells. Accordingly, on May 20, 1986, the state issued permit D-578, which allowed RTG to begin mining the 21.8 acres.

{¶7} After receiving the D-578 permit, Rossiter testified, RTG paid $100,000 to prepare the land for mining, including building a sediment pond, establishing drainage controls, removing and segregating topsoil, and building roads and ramps into the excavation.

{¶8} On June 5, 1987, pursuant to permit D-578-1, the permit area was revised to include an additional 77.2 acres adjacent to the original permit area. The DOR found that "[g]round water supplies monitored up to the date of this written finding have not displayed any significant changes in the quality and quality [sic] to the Village of Pleasant City's well field."

{¶9} On September 10, 1987, the aquifer that served the village's water supply was designated a sole-source aquifer by the United States Environmental Protection Agency.

{¶10} On September 21, 1988, pursuant to R.C. 1513.073, the village filed a petition with the DOR that sought to designate 833 acres in Valley Township that lie below 820 feet in elevation as UFM because mining in this area would adversely affect the aquifer that supplies the village's wells.

{¶11} On October 6, 1989, the chief of the DOR designated approximately 275 of the requested 833 acres as UFM. The chief determined that mining in this area could reduce the long-term productivity of the village's water wells. The UFM designation affected property that RTG sought to mine. RTG and the village appealed from the chief's decision to the Ohio Reclamation Board of Review ("board").

**{¶12}** Before the appeal was decided, the area subject to the permit was increased by 8.4 acres. The board found that "[b]ased on the monitoring data collected by the Division of Water it is not anticipated that the quantity of water to the Village of Pleasant City's well field will be jeopardized by the proposed mining operation, application # D-0578-2."

**{¶13}** Ultimately, however, on June 16, 1994, the board issued an order that designated as UFM the entire 833 acres, which consisted of all lands in Sections 7 and 8 of Valley Township that lie below 820 feet. The UFM designation prevented RTG from mining much of its property.

### III. RTG's Mandamus Proceedings

**{¶14}** On September 21, 1994, RTG filed a complaint in the Franklin County Court of Common Pleas seeking a writ of mandamus to compel the state to appropriate the coal located within the UFM-designated area. RTG alleged that the UFM designation was a taking of its coal rights by regulation.

**{¶15}** On April 22, 1996, the trial court dismissed RTG's complaint. On appeal, the Tenth District Court of Appeals reversed the trial court's judgment and remanded the matter for a hearing and a determination whether a taking had occurred. *State ex rel. R.T.G., Inc. v. Ohio Dept. of Natural Resources* (Mar. 31, 1997), Franklin App. No. 96APE05-662, 1997 WL 142363. The state filed a discretionary appeal with this court, which was not allowed. *State ex rel. R.T.G., Inc. v. Ohio Dept. of Natural Resources* (1997), 79 Ohio St.3d 1482, 683 N.E.2d 787. On remand to the trial court, RTG dismissed its complaint.

**{¶16}** On August 6, 1998, RTG filed a complaint in the Tenth District Court of Appeals seeking a writ of mandamus to compel the state to initiate appropriation proceedings. *State ex rel. R.T.G., Inc. v. Ohio Dept. of Natural Resources*, 141 Ohio App.3d 784, 2001-Ohio-4267, 753 N.E.2d 869.

**{¶17}** The case was referred to a magistrate. In March 2000, RTG amended its complaint to add James and Phyllis Rossiter and the Myron Fishel Scholarship Trust as additional relators.[2]

**{¶18}** On April 13, 2000, the state filed a motion for judgment on the pleadings against the Rossiters and the trust, alleging that their claims were barred by the statute of limitations. The magistrate denied the state's motion, finding that a 21-year statute of limitations applied.

**{¶19}** For purposes of applying the takings analysis, the magistrate divided RTG's land into two parcels. The first parcel consisted of the tracts of land that RTG owned in fee located within the UFM-designated area. The second parcel consisted of the tracts of land in which RTG owned or leased only coal rights located within the UFM-designated area.

**{¶20}** As to the property owned in fee, the magistrate applied the *Penn Cent.* takings test (applied when the regulation deprives the property of less than 100 percent of its economic value). The magistrate determined that the UFM designation did not result in a taking because, even though the designation prevented RTG from mining any coal, the surface estate still had value.

**{¶21}** As to the coal rights, the magistrate applied the takings test of *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (applied when the regulation deprives the property of 100 percent of its economic value). The magistrate determined that the UFM designation did result in a taking because it deprived RTG of all value of its coal rights (i.e., the ability to excavate and sell the coal), but ultimately determined that no compensation was due because mining would constitute a nuisance. See id. at 1027-1030, 112 S.Ct. 2886, 120 L.Ed.2d 798. Accordingly, on October 30, 2000, the magistrate issued findings of fact and conclusions of law that denied the writ.

---

2. The Rossiters and the trust were the named lessees on several of the coal leases at issue herein but were not included as relators in RTG's initial complaint.

{¶22} Both RTG and the state filed objections to the magistrate's decision. The appellate court held that the magistrate erred in applying a 21-year statute of limitations to the claims filed by the relators. However, it held that even in applying the more appropriate four-year statute of limitations, R.C. 2305.09(D), the relators' claims were not time-barred.

{¶23} On the remaining issues, the appellate court adopted the magistrate's decision in its entirety except with regard to the magistrate's conclusion that RTG's mining constituted a nuisance. The appellate court held that RTG's mining was not a nuisance. Thus, the appellate court issued a writ of mandamus that compelled the state to appropriate the tracts of land in which RTG owned coal rights only and that were located within the UFM-designated area.

{¶24} On April 9, 2001, RTG moved the appellate court for an award of attorney fees and costs with regard to the mandamus action. The appellate court denied the motion.

{¶25} The state filed an appeal and RTG filed a cross-appeal of the judgment granting a writ of mandamus to compel the state to initiate appropriation proceedings. RTG also filed a separate appeal of the judgment denying RTG attorney fees and costs. We consolidated these appeals.

{¶26} There are several issues for this court to address. The first is whether the applicable statute of limitations expired before RTG moved to add the Rossiters and the trust as parties. The second is whether the state's UFM designation resulted in a regulatory taking of RTG's property. In order to answer this question, we must first determine the relevant parcel to which the takings analysis is applied. The third is whether RTG can recover attorney fees and costs.

### IV. Statute of Limitations

{¶27} Appropriation cases "shall be governed by the law applicable in civil actions." R.C. 163.22. Unless a particular statute contains a limitation, a civil action must be commenced within a period prescribed in R.C. 2305.03 to 2305.22.

R.C. 2305.03. Neither R.C. Chapter 163 nor Chapter 2731 (mandamus) contains a statute of limitations. Therefore, we must examine R.C. 2305.03 to 2305.22 to determine the most appropriate limitation to apply in this case.

{¶28} This court has previously held that where a landowner sought to compel a railroad to commence an appropriation action for property that it had taken from the landowner pursuant to R.S. 3283, a predecessor of R.C. 4955.02, the appropriate statute of limitations was 21 years. *Lawrence RR. Co. v. O'Harra* (1891), 48 Ohio St. 343, 28 N.E. 175, paragraph one of the syllabus; see, also, *Fries v. Wheeling & Lake Erie Ry. Co.* (1897), 56 Ohio St. 135, 46 N.E. 516. In applying a 21-year limitation, this court stated, "The remedy in [an appropriation case] is a substitute for an action to recover the possession, and we fail to perceive why it should be barred in any shorter period than an action for such purpose; particularly, as it would seem that * * * a proceeding to compel condemnation is the only remedy of the landowner." *O'Harra*, 48 Ohio St. at 353, 28 N.E. 175.

{¶29} We now disagree with the reasoning in *O'Harra*. We do not believe that an appropriation case "is a substitute for an action to recover the possession" of real estate. *O'Harra*, 48 Ohio St. at 353, 28 N.E. 175. An appropriation case seeks monetary compensation for real property that was taken from the property owner and for damages to the residue remaining with the property owner. Actions to recover possession of real estate traditionally have had a longer statute of limitations than actions for damages, which simply seek monetary recovery. Therefore, to the extent that *O'Harra* and *Fries* hold that a 21-year statute of limitations (now R.C. 2305.04) applies to an action to compel appropriation proceedings, we overrule those cases.

{¶30} We also disagree with the appellate court's finding that the limitation in R.C. 2305.09(D) applies to the claims filed by the Rossiters and the trust. R.C. 2305.09(D) provides a limitation "[f]or an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12[,] 2305.14 and

1304.35 of the Revised Code." While none of the limitations listed in R.C. Chapter 2305 is a perfect fit for an action to compel appropriation proceedings, we find that the most appropriate statute of limitations is set out in R.C. 2305.07. It provides that "an action upon a *contract not in writing*, express or *implied*, or upon a liability created by statute * * * shall be brought within six years after the cause thereof accrued." (Emphasis added.) R.C. 2305.07.

{¶31} A contract implied in fact is "a contract that the parties presumably intended, either by tacit understanding or by the assumption that it existed." Black's Law Dictionary (7th Ed.1999) 322. In an appropriation action, although the amount may be in dispute, when the state takes property, it is impliedly contracting that it will pay the property owner just compensation. See, e.g., *Yearsley v. W.A. Ross Constr. Co.* (1940), 309 U.S. 18, 21, 60 S.Ct. 413, 84 L.Ed. 554 (if a regulation is determined to be a taking, the government has impliedly promised to pay compensation). Accordingly, we hold that the statute of limitations applicable to a mandamus action to compel the state to begin appropriation proceedings is the six-year limitation set out in R.C. 2305.07.

{¶32} In this case, the cause of action accrued when the board issued its final decision on June 16, 1994, which designated RTG's property as unsuitable for mining. RTG filed its complaint on August 6, 1998. RTG moved to amend its complaint to add the Rossiters and the trust on March 7, 2000. Accordingly, the addition of the Rossiters and the trust was within six years of the date the action accrued. Thus, we affirm the appellate court's determination that the Rossiters' and the trust's claims are not barred by the statute of limitations, albeit for different reasons.

V. Regulatory-Takings Law

{¶33} Both the United States and the Ohio Constitutions provide that private property shall not be taken for public use without just compensation. Fifth and Fourteenth Amendments to the United States Constitution; Section 19, Article

I, Ohio Constitution; see, also, R.C. Chapter 163. The purpose of the Takings Clause is to prevent government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States* (1960), 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554.

{¶34} It was Justice Holmes who first recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322. However, it was not until 1978 that the United States Supreme Court formulated a test to help define when a regulation "goes too far" and results in a compensable taking. See *Penn Cent. Transp. Co. v. New York City* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." *Palazzolo v. Rhode Island* (2001), 533 U.S. 606, 634, 121 S.Ct. 2448, 150 L.Ed.2d 592 (O'Connor, J., concurring). The three criteria that *Penn Cent.* identified to be examined in regard to a regulatory taking are (1) the nature of the governmental regulation, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations. *Penn Cent.* at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631.

{¶35} *Penn Cent.* provides the proper taking test when the regulation deprives the property of less than 100 percent of its economically beneficial use. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002), 535 U.S. 302, ___, 122 S.Ct. 1465, 1483, 152 L.Ed.2d 517, 545, see, also, *Palazzolo v. Rhode Island*, 533 U.S. at 617, 121 S.Ct. 2448, 150 L.Ed.2d 592.

{¶36} In 1992, the Supreme Court again visited the regulatory-takings law in *Lucas*. The court acknowledged the *Penn Cent.* ad hoc balancing test, but recognized two situations in which a regulation results in a taking "without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas,*

505 U.S. at 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798. The first is where a regulation requires a physical invasion of property. E.g., *Loretto v. Teleprompter Manhattan CATV Corp.* (1982), 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (New York law that required landlords to permit cable television companies to place cable facilities in their buildings constituted a taking even though the intrusion, one and one-half cubic feet, was minimal). The second is "where regulation denies all economically beneficial or productive use of the land." *Lucas* at 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798. However, even if a regulation results in categorical taking, no compensation is due if the claimant's use of the land violates "restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798.

**{¶37}** The rule in *Lucas,* recognizing these categorical takings, applies only "when a regulation deprives an owner of '*all* economically beneficial uses' of his land." (Emphasis in *Lucas*.) *Tahoe-Sierra Preservation Council,* 535 U.S. 302, ___, 122 S.Ct. 1465, 1483, 152 L.Ed.2d 517, 545, quoting *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798.

**{¶38}** Thus, under *Lucas,* if a regulation deprives the property of all of its economic value, there is no need to examine the policy behind the regulation, and a compensable taking results, unless the regulation merely prevents use of the property in a manner that creates a nuisance under state law.

**{¶39}** Accordingly, the United States Supreme Court has created a dichotomy in regulatory takings. *Lucas* applies where the regulation has deprived the property of all economic value, and *Penn Cent.* applies where the regulation deprives the property of less than all economic value.

A. Defining the Relevant Parcel, or The Denominator Problem

{¶40} The regulatory-takings analysis requires a court to compare the value of the property that has been taken by the regulation against the value of the property that remains. *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987)*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472. "[O]ne of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.' " Id., quoting Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law (1967), 80 Harv.L.Rev. 1165, 1192. The denominator, or the "relevant parcel," is the property interest that is subject to the regulation. See The Relevant Parcel Issue (1993), C872 ALI-ABA 167. The numerator of this fraction is the value of the property that has been taken due to the regulation. Fee, Unearthing the Denominator in Regulatory Takings Claims (1994), 61 U.Chi.L.Rev. 1535, 1536. If this fraction equals one (i.e., the value of the property taken equals the value of the relevant parcel), then there has been a categorical taking as defined in *Lucas* and compensation is due unless the use of the property conflicts with background principles of the state's law of property and nuisance. *Lucas,* 505 U.S. at 1027, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798. But if the fraction equals anything less than one, then there has been no categorical taking, and the *Penn Cent.* ad hoc balancing test applies to determine whether a compensable taking has occurred.

{¶41} Determining the relevant parcel of the takings fraction is critical because it usually determines the applicable takings test. In other words, determining how broadly or narrowly the relevant parcel is defined will determine whether there has been a complete deprivation of the economic value of the property, or whether a taking of something less has occurred. The more broadly the relevant parcel is defined, the less likely that a regulation will result in a complete economic deprivation and that the *Penn Cent.* test will apply; conversely,

the more narrowly the relevant parcel is defined, the more likely that a regulation will result in a complete economic deprivation and that the *Lucas* test will apply.

**{¶42}** Determination of the denominator of the takings fraction has been a persistent and difficult issue. *Palazzolo,* 533 U.S. at 631, 121 S.Ct. 2448, 150 L.Ed.2d 592. The determination of the relevant parcel can include consideration of the vertical divisions of property (e.g., surface rights, air rights, and mineral rights) and horizontal divisions of property (e.g., surface divisions of property, such as can be shown on a map). Fee, Unearthing the Denominator in Regulatory Takings Claims, 61 U.Chi.L.Rev. at 1537, fn. 7 and 8.

1. The Appellate Court Erred in Defining the Relevant Parcel

**{¶43}** In defining the relevant parcel, "[t]he effort should be to identify the parcel as realistically and fairly as possible, given the entire factual and regulatory environment." *Ciampitti v. United States* (1991), 22 Cl. of Ct. 310, 319. The appellate court determined that RTG's property consisted of two relevant parcels for purposes of the takings analysis, one being all the tracts of land in which RTG owned only coal rights, and the other being the tracts of land that it owned in fee. There is no analysis in the court's decision as to how the court arrived at this conclusion. For reasons made clear in our analysis below, we reject the appellate court's determination that there are two relevant parcels in this case.

2. The Relevant Parcel in the Vertical Context

**{¶44}** RTG argues that we should define the relevant parcel in the vertical context as including only the coal rights that lie under RTG's property to the exclusion of any surface rights. The state asserts that coal rights cannot be severed from surface rights for purposes of this analysis and thus the relevant parcel must include both surface and coal rights. In this case, we agree with RTG.

**{¶45}** In *Penn Cent.,* the court specifically declined to sever property rights in the vertical context for purposes of a takings analysis. In *Penn Cent.*, a regulation prevented Penn Central from building a 55-story addition onto Grand Central

13

Station. Penn Central argued that the regulation deprived it of its use of the air rights over Grand Central Station. The court declined to consider Penn Central's air rights above Grand Central Station as a separate estate from the remainder of the property pursuant to the parcel-as-a-whole rule. *Penn Cent.,* 438 U.S. at 130, 98 S.Ct. 2646, 57 L.Ed.2d 631.

**{¶46}** *Penn Central*'s nonseverability rule was reaffirmed in *Keystone Bituminous Coal Assn.*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472. In *Keystone,* the Bituminous Mine Subsidence and Land Conservation Act, Pa. Stat. Ann., Title 52, Section 1406.1 et seq., required coal companies during subsurface mining to leave certain amounts of coal in place to prevent subsidence of the surface estate. Keystone alleged that the statute resulted in a regulatory taking of the coal that was required to be left in place. Applying the parcel-as-a-whole rule, the court held that the coal required to be left in place by the Subsidence Act did "not constitute a separate segment of property." Id. at 498, 107 S.Ct. 1232, 94 L.Ed.2d 472.

**{¶47}** However, subsequent to *Penn Cent.* and *Keystone*, some members of the court have expressed misgivings about the parcel-as-a-whole rule. In *Lucas,* the court discussed the uncertainty in determining the denominator and the resulting inconsistent pronouncements by the court in that regard. *Lucas*, 505 U.S. at 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798, fn. 8; see, also, *Palazzolo*, 533 U.S. at 631, 121 S.Ct. 2448, 150 L.Ed.2d 592 (recognizing the discomfort of some justices with the parcel-as-a-whole rule). The majority in *Lucas* suggested that the solution to the difficult issue of determining the denominator "may lie in how the owner's reasonable expectations have been shaped by the State's law of property—i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value." *Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798, fn. 7.

{¶48} That discussion in *Lucas* was merely dicta. However, property rights are defined by state law. *Webb's Fabulous Pharmacies, Inc., v. Beckwith* (1980), 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358, citing *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. Furthermore, states are free to interpret their constitutions independently of the United States Constitution so long as that interpretation affords, as a minimum, the same protection as its federal counterpart. *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, at paragraph one of the syllabus.

{¶49} We find that the criticism in *Lucas* regarding how to define the relevant parcel for the takings analysis is particularly relevant to coal rights in Ohio. Unlike other individual rights within the bundle of rights that make up a complete property estate, mineral rights are recognized by Ohio law as separate property rights. *Moore v. Indian Camp Coal Co.* (1907), 75 Ohio St. 493, 80 N.E. 6. Therefore, because the ownership of the coal is "both severable and of value in its own right, it is appropriate to consider the effect of regulation on that particular property interest." *Keystone*, 480 U.S. at 520, 107 S.Ct. 1232, 94 L.Ed.2d 472 (Rehnquist, C.J., dissenting). Accordingly, in determining the relevant parcel in a takings analysis pursuant to the Takings Clause of the Ohio Constitution, Section 19, Article I, coal rights are severable and may be considered as a separate property interest if the property owner's intent was to purchase the property solely for the purpose of mining the coal.

{¶50} It is undisputed that RTG is a company that surface-mines coal. It is also undisputed that RTG acquired all the property at issue herein, whether in fee or through coal leases or purchases, for the sole purpose of surface-mining the coal from these properties. The surface rights served as nothing more than an impediment to acquiring the coal. Thus, the right to mine coal "is what, and only what, this suit is all about." *Whitney Benefits, Inc. v. United States* (C.A.Fed.1991),

926 F.2d 1169, 1174. Therefore, we hold that the relevant parcel for the takings analysis in the vertical context is the coal rights.

### 3. The Relevant Parcel in the Horizontal Context

**{¶51}** RTG urges us to define the relevant parcel in the horizontal context as the property that is located within the UFM-designated area. The state urges the court to find that the relevant parcel is all 500 acres of RTG's property pursuant to the parcel-as-a-whole rule. See *Penn Cent*. For the following reasons, we find that the relevant parcel in the horizontal context is limited to RTG's property that is within the UFM-designated area.

**{¶52}** Although contiguous tracts of property are typically considered as a single relevant parcel for purposes of a takings analysis, factual nuances may dictate a more flexible approach. *Loveladies Harbor, Inc. v. United States* (C.A.Fed.1994), 28 F.3d 1171, 1181. These factual nuances may include the claimant's investment-backed expectations. *Machipongo Land & Coal Co. v. Pennsylvania* (Pa.2002), 569 Pa. 3, 799 A.2d 751, 768-769.

**{¶53}** Of the approximately 500 acres of contiguous property at issue herein approximately 100 of these acres are located outside the UFM-designated area. The state contends that these 100 acres of property are part of the relevant parcel because this property includes coal rights.

**{¶54}** RTG has submitted evidence that of the approximately 500 acres at issue herein, the state's UFM designation prevented it from mining approximately 218 "coal acres," or 1.3 million tons of coal. RTG has admitted that fringe amounts of coal exist outside the regulated area. However, RTG's mining of the coal was dependent upon economies of scale. Therefore, when the UFM designation prevented RTG from mining a majority of its coal reserves within the regulated area, it made mining those minimal reserves outside the UFM-designated area economically impracticable.

**{¶55}** Because there is no evidence that the coal outside the regulated area can be economically mined independent of the reserves in the regulated area, we hold that the relevant parcel in the horizontal context is limited on these facts to RTG's coal that is located within the UFM-designated area.

### 4. The Relevant Parcel

**{¶56}** Merging our analyses regarding the relevant parcel in vertical and horizontal contexts, we hold that the relevant parcel in this case is the remaining coal located within the UFM-designated area.

### B. The UFM Designation Destroyed RTG's Coal Rights

**{¶57}** "What makes the right to mine coal valuable is that it can be exercised with profit." *Pennsylvania Coal*, 260 U.S. at 414, 43 S.Ct. 158, 67 L.Ed. 322. The UFM designation makes it impossible for RTG to mine coal, thereby depriving RTG from exercising its coal rights for profit. Thus, imposition of the UFM designation deprived RTG's coal rights of *all* economic value. Accordingly, applying *Lucas*, we hold that the UFM designation resulted in a categorical taking of RTG's coal rights.

### C. Nuisance

**{¶58}** A categorical taking under Lucas is compensable unless the proposed use of the property is a nuisance. *Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798. We find that RTG's actions herein did not constitute a nuisance for the following reasons.

**{¶59}** In examining the nuisance element of *Lucas*, the appellate court herein, citing *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724, paragraphs two and three of the syllabus, found that there are two types of nuisance—absolute and qualified. An absolute nuisance is based on either intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken. A qualified

nuisance is essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm, ultimately resulting in injury.

{¶60} The appellate court then concluded that coal mining is not an absolute nuisance, because it can be conducted safely when care is taken. The court concluded that coal mining is also not a qualified nuisance, because coal mining itself is not nuisance, but rather a lawful activity subject to permit. Finally, the appellate court found that RTG had acted in a reasonable manner in mining the property and, until the UMF designation was issued, was allowed to mine the property pursuant to permits.

{¶61} After examining the law and the record in this case, we adopt the appellate court's analysis regarding the issue of nuisance in its entirety and consequently find that RTG's mining of its property did not constitute a nuisance as a matter of law for purposes of the takings analysis. Accordingly, the UFM designation resulted in a *compensable* taking of RTG's coal.

## VI. Attorney Fees

{¶62} RTG also sought an award of attorney fees and costs pursuant to R.C. 2335.39 and 2731.11, which was denied by the appellate court.

{¶63} Pursuant to R.C. 2335.39, the state must pay attorney fees if (1) the state was not substantially justified in initiating the matter in controversy, (2) there are no special circumstances that make the award unjust, (3) the moving party is not the state but is a party to the legal action at issue, and (4) the moving party prevailed in the legal action.

{¶64} The state argues that under R.C. 2335.39, fees are recoverable where the state initiates the *legal action* in question, as opposed to the state initiating the *matter in controversy* that resulted in the legal action. See *Highway Valets, Inc. v. Ohio Dept. of Transp.* (1987), 38 Ohio App.3d 45, 526 N.E.2d 112.

{¶65} R.C. 2335.39(B)(2) states:

**{¶66}** "Upon the filing of a motion under this section, the court shall review the request for the award of compensation for fees and determine whether the position of the state in initiating the *matter in controversy* was substantially justified, whether special circumstances make an award unjust, and whether the prevailing eligible party engaged in conduct during the course of the action or the appeal that unduly and unreasonably protracted the final resolution of the matter in controversy." (Emphasis added.)

**{¶67}** We construe this language to permit fees where the state initiates either the *conduct* that gave rise to the litigation *or* initiates the *litigation* caused by the controversy. Had the General Assembly intended to permit fees only where the state initiates the litigation, then it could have indicated that fees would be awarded only where the state initiated "litigation," as opposed to the more general language of "matter in controversy" that was actually used.

**{¶68}** Furthermore, to construe this language otherwise would lead to an absurd result in this case. Clearly the purpose of R.C. 2335.39 is to protect citizens from unjustified state action. If fees under R.C. 2335.39 were permitted only where the state initiated the legal action, the protection that R.C. 2335.39 provides would not be available where landowners, such as RTG in the instant case, were compelled to initiate legal action to get relief from the state.

**{¶69}** The state also argues that it was substantially justified in not filing a condemnation action against RTG's property. The state has the burden of proving that its position in initiating the matter in controversy was substantially justified. R.C. 2335.39(B)(2). Clearly the state has the authority to regulate mining pursuant to R.C. 1513.39. However, in this case, the regulation resulted in a taking of RTG's property. While the state would have had no obligation to compensate RTG if RTG's mining would have been a nuisance, the state still had the obligation to file a condemnation action and have that issue determined by a court. Thus, we find

that the state has failed to show that it was substantially justified in failing to file a condemnation action in this case.

**{¶70}** Because we find that the state was not substantially justified in failing to initiate appropriation proceedings, and RTG otherwise qualifies for attorney fees under R.C. 2335.39, we hold that the appellate court erred in denying RTG attorney fees and reverse the appellate court on that issue.

**{¶71}** Pursuant to R.C. 2731.11, where a complaint seeking a writ of mandamus judgment is rendered in favor of the relator, the relator is entitled to costs. Therefore, RTG is also entitled to costs.

VII. Conclusion

**{¶72}** We hold that the state's UFM designation resulted in a categorical taking of all of RTG's coal rights pursuant to *Lucas*. Therefore, we reverse the judgment of the court of appeals and issue a writ of mandamus to compel the state of Ohio to appropriate the coal located within the UFM-designated area. In the appropriations proceedings, the value of RTG's coal within the UFM-designated area will be the sole issue to be determined.

**{¶73}** We also reverse the judgment of the court of appeals that denied RTG attorney fees and costs, and remand the cause for the appellate court to determine RTG's reasonable attorney fees and costs.

Judgments affirmed in part,

reversed in part,

writ issued

and cause remanded.

F.E. SWEENEY and PFEIFER, JJ., concur.

RESNICK, J., concurs in syllabus and judgment.

MOYER, C.J., and DOUGLAS, J., dissent and would affirm the court of appeals in all respects.

COOK, J., dissents.

20

_____

Porter, Wright, Morris & Arthur, L.L.P., Mark S. Stemm and J. Kenneth Thien, for R.T.G., Inc. et al.

Betty D. Montgomery, Attorney General, Mark G. Bonaventura and John P. Bartley, Assistant Attorneys General, for the state of Ohio et al.

R.S. Radford, for amicus curiae Pacific Legal Foundation in support of R.T.G., Inc. et al.

Thomas P. Michael, for amicus curiae Ohio Coal Association in support of R.T.G., Inc. et al.

Schottenstein, Zox & Dunn Co., L.P.A., and Kristopher M. Huelsman, for amicus curiae Ohio Environmental Council in support of the state of Ohio.

Timothy J. Dowling, for amici curiae Pleasant City and Community Rights Counsel in support of the state of Ohio.

_____