DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal of the January 19, 2007 judgment of the Ottawa County Court of Common Pleas which granted appellees' request for a permanent injunction enjoining defendants-appellants, Edward J. Wiza, III, Stephanie Wiza, and the Catawba Island Cattle Company from maintaining cattle or swine on the Wiza property. For the reasons that follow, we affirm the trial court's judgment. *Page 2 
 {¶ 2} On June 5, 2006, appellees Lost Lake Development, the developer of The Marsh's Edge, and Snyder Enterprises, the developer of Catawba Bay Subdivision, and several owners of homes and residential lots in the above-named developments, commenced an action against appellants alleging nuisance, intentional infliction of emotional distress, diminished value of real estate, and trespass. The complaint also requested an injunction. The complaint stemmed from appellants' maintenance of cattle and swine on the adjacent Wiza property. Appellees complained of the noise and odor from the animals; appellees also complained of alleged surface water run off containing animal feces.
 {¶ 3} On June 16, 2006, appellants filed an answer and several counterclaims including malicious prosecution and abuse of process. The counterclaims principally related to the October 21, 2004 goose-shooting incident following which Edward Wiza was charged with hunting upon the land of another without permission and killing a migratory bird without making a reasonable effort to retrieve the bird. The charges were subsequently dismissed.
 {¶ 4} On July 6, 2006, with counsel, a judicial view of the property was conducted. On July 12, 2006, a bench trial was held on the merits of the permanent injunction regarding the alleged nuisance or nuisance per se; determinations as to monetary damages and appellants' counterclaims were deferred. During the three-day trial, testimony from the complaining landowners, appellant Edward Wiza, eyewitnesses, law enforcement, and expert witnesses was presented. *Page 3 
 {¶ 5} Catawba Island Township Police Officer, Todd Parkinson, testified that on October 21, 2004, he was dispatched to the area behind the Wiza property regarding a hunting complaint made by James Radloff, a resident of adjacent Marsh's Edge Subdivision. Radloff claimed that Wiza had shot a goose off his property. Wiza approached him and Radloff and a heated exchange took place. According to Parkinson, Wiza stated that: "I'm going to f**king put pigs in here and chase your f**king asses back to Cleveland. I have been here for 15 years and I'm sick of you people." This statement was contained in Parkinson's report.
 {¶ 6} Nick Shifflet, Wiza's insurance agent, testified that in the fall of 2004, he had a conversation with Wiza about the goose shooting incident. According to Shifflet, Wiza stated: "Let's see how they like it when I put f**king pigs back there." Shifflet said that Wiza was somewhat agitated when he said it.
 {¶ 7} Shifflet testified that in the spring of 2006, he and Wiza had a conversation about the metal pig feeder and that the noise probably disrupted the neighborhood. Shifflet stated that it appeared to be a "positive" comment. During cross-examination Shifflet stated that he is still Wiza's insurance agent.
 {¶ 8} Molly Sass testified that she sold Wiza hay for his cattle from her farm. According to Sass, on July 26, 2005, Wiza stated that he was going to put pigs on his property to "piss off his neighbors. During cross-examination, Sass admitted that her husband and plaintiff William McDowell have a professional relationship. Further, Sass *Page 4 
acknowledged that she is a kindergarten teacher and that she was aware that Wiza had been actively attempting to have the school bond issue defeated.
 {¶ 9} William McDowell, Sr., testified that in 2004, he and his wife built a home in the Catawba Bay Subdivision. McDowell stated that he had smelled manure around the time the house was erected but he thought that it was part of the nursery operation next door to Wiza. McDowell testified that he observed construction of the pig facility begin in July or August 2005; at the time he did not know what Wiza was building. McDowell testified that during this time Wiza also kept cattle on the property.
 {¶ 10} In late February or early March 2006, McDowell first became aware of pigs on the Wiza property. McDowell testified that due to the odor from Wiza's livestock he is not able to enjoy his yard or deck or open his windows. McDowell further testified that the noise from the pig feeder continues day and night. Finally, McDowell testified that he is very concerned about the effect the noise and odor may have on his property value.
 {¶ 11} When questioned, McDowell admitted that he never contacted Wiza to complain about his livestock operation. McDowell indicated that due to a prior incident he believed that any discussion with Wiza would have been futile. McDowell further admitted that when his home was under construction he was aware that Wiza had cattle on his property. *Page 5 
 {¶ 12} McDowell's wife, Mary McDowell, testified next. Mrs. McDowell reiterated that when the wind is blowing a certain way the odor from the pigs forces them to stay inside.
 {¶ 13} Gus Panas, another Catawba Bay Subdivision resident, testified that his house is approximately 11 feet from the pig sty and was completed Memorial Day weekend 2005. Panas acknowledged that the cattle on Wiza's property arrived during their home construction and that he had no complaints about them.
 {¶ 14} Panas testified that since the arrival of the pigs in March 2006, there has been constant "clanging" from the feed bins; due to the noise he had to move his bedroom to the basement. Panas explained that the odor has prevented him from doing any landscaping work in his backyard; due to the proximity of the pigs, the wind direction was irrelevant.
 {¶ 15} Panas then testified about an incident on March 13, 2006. Brian Snyder, also a resident of Catawba Bay Subdivision, came to his home and showed Panas a pump tube coming through his fence and pumping pig manure out of the pit and into his backyard. Panas also stated that water from the pond where the cows waded in had also overflowed and was running onto the side of his property.
 {¶ 16} During cross-examination, Panas admitted that on March 13, 2006, there was a significant amount of rainfall. Panas also stated that he did not see Wiza place the pump through his fence. Pandas stated that he did not complain to Wiza about the pigs. *Page 6 
 {¶ 17} Michael Moody testified that he and Mr. Panas live together. Moody testified that the cattle did not bother him; he became offended when the pigs arrived on the Wiza property. Moody never complained to Wiza about the livestock.
 {¶ 18} Brian Snyder testified next. Snyder lives in the Catawba Bay Subdivision and his father and uncle developed Marsh's Edge. Snyder is owner and manager of Catawba Leasing Company which supervises maintenance, site work and excavating for Catawba Bay and Marsh's Edge. Snyder testified that he is responsible for maintaining the properties and nature trails, for protecting the wetlands and waterways in Catawba Bay.
 {¶ 19} Snyder testified that he monitored the activities at the Wiza property; he is around the property daily. On March 13, 2006, Snyder observed the water coming off of the Wiza property onto the Panas/Moody and McDowell properties. Snyder took a series of photographs depicting the hose and water flow; the photographs were admitted into evidence. Snyder testified that he pulled the hose through the fence and called Catawba Island Township Police Officer David Downing to pick up the pump and return it to Wiza. Snyder testified that the pump smelled "rancid." On June 21, 2006, Snyder also took a videotape of the water run off; several additional photographs were taken and were admitted into evidence. Snyder testified that he has seen the water in the manure pit at or near capacity on two to four different occasions.
 {¶ 20} During cross-examination, Snyder was questioned about photographs depicting a drainage pipe with water flowing off of Wiza's property. Snyder denied *Page 7 
knowledge of an agreement between the prior owner and Snyder's father to allow the pipe to be installed. Snyder was also questioned as to how he knew that the dark water in the photographs contained feces; Snyder stated that the water had a definite manure smell.
 {¶ 21} Melvern Ayers, Jr., testified that he is a resident of Marsh's Edge Subdivision; he began construction of his home in 2002. Ayers testified that he first became aware of the cows in late 2004. Regarding the pigs, Ayers stated that they have had a huge impact on his enjoyment of the outdoors at and around his house. Ayers complained of the noise and odor from the pigs.
 {¶ 22} Ayers testified that he owns a restaurant where Wiza was a regular customer. Ayers stated over several months Wiza became increasingly abusive towards his staff; eventually Ayers asked Wiza and his wife to leave the restaurant.
 {¶ 23} During cross-examination, Ayers admitted that he had no problem with the cows. Ayers further stated that his wife sells real estate on behalf of Catawba Bay Subdivision.
 {¶ 24} Catawba Island Township Police Officer David Downing testified that he responded to the March 13, 2006 water pumping incident. Downing testified that he first received a call from Wiza stating that Snyder and another individual had taken his sump pump and hose. Officer Downing stated that he was on his way to speak with Wiza when the dispatcher called and indicated that Snyder had also called the department. According to Officer Downing, Snyder called to request that the police return the pump to Wiza and to make a complaint about Wiza dumping waste onto his property. Snyder *Page 8 
also took Officer Downing to view the area where the water had been pumped and where the pond had overflowed. Officer Downing testified that the area had "a very pungent odor of pig excrement." Downing stated that there were about ten pigs and that they were small.
 {¶ 25} Matthew Mueller testified that on May 21, 2006, he was at Heigel Park in Catawba Island Township when he saw Wiza, in a truck with holding tanks, back on to a property that Wiza owns directly across the street. Mueller stated that after Wiza left he walked over to the area and could smell the pig excrement.
 {¶ 26} During cross-examination, Mueller acknowledged that his wife is on the school board and that Wiza had been vocal in his opposition to the school bond issue; the issue was ultimately defeated.
 {¶ 27} Michael Herdlick, Vice President of Technical Services for Aqua Tech Environmental Laboratories, testified that at the request of Robert Snyder he performed fecal chloroform testing. Herdlick testified that he took soil samples and a water sample from sites adjacent to the Wiza property. Some of the samples contained nitrogen; Herdlick testified that the nitrogen could be present due to goose or dog droppings or from a septic system. Herdlick stated that there is no way to determine the source.
 {¶ 28} Finally, appellees presented the expert trial deposition testimony of Michael Brugger; the deposition was taken on July 7, 2006. Brugger testified that he is an associate professor at The Ohio State University and holds a B.S., M.S., and Ph.D. in *Page 9 
agricultural engineering. Brugger stated that he has spent his entire career working in the area of livestock facility design.
 {¶ 29} Brugger testified that Wiza's current swine facility and manure handling system was not appropriate for the property. Brugger stated that "[i]ts design and location gives the maximum negative effect from odor and noise to the neighbors to the north and northeast." Brugger clarified that the liquid manure storage system was not appropriate at that location for any number of swine and that the system poses the greatest threat of creating a nuisance. In arriving at this conclusion, Brugger visited that site and completed a livestock site evaluation scoring sheet, developed by several agencies, to determine the desirability of a potential facility cite.
 {¶ 30} Brugger testified that the proximity of the neighbors is a main concern due to the odor and the potential for manure runoff onto the adjoining properties. Brugger stated that he can see no way, based upon the current design of the facility, to minimize the impact on the neighbors. Brugger agreed that, in essence, Wiza was "maximizing" the nuisance by his choice of liquid manure storage. Brugger stated that during his May visit, he picked up some soil to the north of the facilities and that it had a definite swine odor.
 {¶ 31} Appellants then presented their case. Michael Libben testified that he is the District Technician for the Ottawa County Soil and Water Conservation District. Libben testified that he received a telephone call from the Ottawa County Health Department about some potential agricultural pollution that could damage Ohio waters. Libben went *Page 10 
to the property in March 2006; Libben testified that he saw no evidence of intentional direction of animal waste off the property.
 {¶ 32} After making a visual observation, Libben sent a letter to Wiza outlining concerns that he had and recommendations of corrections to be completed. Libben testified that Wiza had begun making corrections before they were formally recommended. Specifically, Wiza had put up a barbed wire fence to create a "filter strip barrier" between the cow pasture and the storm sewer. Regarding manure removal option, Libben stated that they were in the process of performing an analysis to determine whether composting was a viable option. Regarding the drainage issues, Libben testified that he was told that the drainage tile had been put there by the prior owners. Finally, Libben stated that based upon his knowledge, Wiza is currently in compliance with the water pollution abatement rules and standards; Wiza had also been cooperative.
 {¶ 33} During cross-examination, Libben acknowledged that composting has a strong potential for odors. Libben also stated that he would not have recommended the site where Wiza placed the pigs. Libben testified that he recommended a contract manure hauler; Libben agreed that it is generally not acceptable to dump manure in a residential area.
 {¶ 34} Michael Gargac testified that he is also a technician for the Ottawa Soil and Water Conservation District. Gargac testified that drainage is his area of "expertise." Gargac stated that he has been to the Wiza property about four times and conducted a "survey" of the property. Gargac testified that he was told that the pond was there when *Page 11 
Wiza purchased the property and that there was a tile for overflow. Gargac stated that the overflow from the pond drains north toward the swale but he could not recall if it had actually run down into the swale and the nearby backyards. Gargac stated that after a heavy rain he would expect to see standing water.
 {¶ 35} Wiza's next-door-neighbor, Don Walter, testified next. Walter stated that Wiza's pigs are a couple hundred yards away from his home and the cows are about ten yards away. Walter stated that he has had no problem with odor or noise and that he frequently uses his yard.
 {¶ 36} Patricia Cerny next testified that she is the Catawba Island Zoning Inspector. Cerny acknowledged that Wiza is in compliance with the zoning code; agriculture is a permitted use in Catawba Island Township.
 {¶ 37} Appellants' expert, Dale Ricker, testified next. Ricker testified that he is employed by The Ohio State University Extension as a swine program specialist. On June 28, 2006, Ricker visited the Wiza property and evaluated the "manure containment." Regarding the odor from the Wiza pigs, Ricker testified that there is always a certain amount of "operational" odor due to the "nature of the business" but that "on the day of the assessment it was probably even less than operational in terms of odor, flies or dust."
 {¶ 38} Ricker testified that in order to minimize the risk of rainwater filling up the manure storage facility, the whole structure needs to be roofed and rain water channeled away. Ricker further stated that once the area is roofed the lids on the feeder bins could be removed and the noise eliminated. To further reduce odor, Ricker recommenced that *Page 12 
the waste material in the pit be removed weekly and that the pig wallow be chlorinated. Ricker noted that the number of pigs present on June 28 appeared to be adequate for the site. Ricker noticed no issues with the cattle.
 {¶ 39} During cross-examination, Ricker acknowledged that manure in the wallow area could actually counter the effects of the chlorine and that the wallow is 21 feet from the nearest house. Ricker also admitted that "uncovered swine manure storage facilities" are odorous and should not be used in sensitive locations, which includes locations within close proximity to residential areas. Ricker testified that he was not familiar with the drainage on the property. Ricker did suggest that the pit could be covered with a tarp but admitted that when the tarp was removed "[i]t would be more of an odor event."
 {¶ 40} Appellant, Edward Wiza, III, was the final witness to testify. Wiza testified that since 1995, when he purchased the property, he planned to raise livestock. Wiza stated that he wanted to raise cows, pigs, and sheep. Regarding the cattle, Wiza testified that he has maintained a maximum of seven and they remain on the property for approximately a year-and-a-half before he uses them for food. Wiza explained that the pigs are a spring to fall operation; Wiza stated that he intended to have most of them slaughtered by August. In addition to personal use, Wiza testified that he uses the animals in conjunction with his fundraising consultant work with law enforcement officers. Wiza donates the animals for cookouts.
 {¶ 41} Wiza testified that he is about to begin roofing the pig sty which will enable him to take the metal doors off the feeders. Wiza also stated that the roof would provide *Page 13 
shelter for the pigs and will make it possible to remove the wallow and add misters to cool the pigs. With regard to the manure containment, Wiza testified that he is going to place some type of cover over the pit and that he has contracted with local farmers to spread the manure on their fields.
 {¶ 42} Wiza testified that he began constructing his livestock facilities in late 2003. Wiza stated that he spent a total of $52,873 for the construction of the cattle facility and $72,661 for the swine facility.
 {¶ 43} Wiza then addressed the goose shooting incident. Wiza stated that he shot a goose over his property, it went down in the marsh and he realized that he would need to get permission to retrieve it. While he was standing there Radloff came over the hill and began "accosting" him. According to Wiza, he asked Radloff if he could retrieve the goose; Radloff threatened to "kick his ass" if came over the fence. Wiza stated that Radloff called the police; Wiza was very upset and "popped off to Radloff. Wiza further stated that he had been upset because he had received several complaints about his cows.
 {¶ 44} Wiza next addressed the conversation that Molly Sass testified about. Wiza stated that they were having a discussion about their cows escaping and complaints they both received from neighbors. According to Wiza he commented that a neighbor who was angry about his cows would really be "pissed off about the pigs. Regarding the comment he made to his insurance agent, Shifflet, Wiza stated that had merely been recounting the hunting incident and his confrontation with Radloff. Wiza stated that his neighbors had never contacted him regarding their complaints. *Page 14 
 {¶ 45} Finally, Wiza denied ever pumping waste from his storage pit onto neighboring land. Wiza stated that he believed that Snyder moved his hose directing it off of his property.
 {¶ 46} Following the trial, the parties submitted proposed findings of fact and conclusions of law. On August 10, 2006, the trial court entered its findings of fact, conclusions, of law, and judgment entry granting a permanent injunction enjoining appellants from maintaining the absolute nuisance of harboring pigs or cows on the property. Thereafter, by agreement of the parties, on January 19, 2007, Civ.R. 54(B) language was added to the judgment entry to allow an appeal of the injunction prior to a hearing on damages. This appeal followed.
 {¶ 47} On appeal, appellants raise the following seven assignments of error:
 {¶ 48} "A. The trial court abused its discretion by granting an injunction based upon findings of fact which are against the manifest weight of the evidence.
 {¶ 49} "B. The trial court abused its discretion by granting an injunction which is overly broad.
 {¶ 50} "C. The trial court abused its discretion by granting an injunction which is contrary to law.
 {¶ 51} "D. The trial court abused its discretion by granting an injunction which denies due process of law to appellants.
 {¶ 52} "E. The trial court abused its discretion by improperly engaging in a judicial rezoning of appellants' property. *Page 15 
 {¶ 53} "F. The trial court abused its discretion in substituting its opinion based upon observations made during a judicial view in place of the evidence in the record.
 {¶ 54} G. The trial court abused its discretion in considering the opinion of plaintiff-appellees' expert witness not based upon facts in evidence."[1]
 {¶ 55} In appellants' first assignment of error, they argue generally that the trial court's granting of an injunction was against the manifest weight of the evidence. Appellants then include the next four assignments of error in their argument; we will first address Assignments of Error 2 through 5 as they relate to the overriding issue of whether the court's judgment was against the weight of the evidence.
 {¶ 56} At the outset we note that injunctive relief is an equitable remedy that is available only where there is no adequate remedy at law.Haig v. Ohio State Bd. of Edn. (1992), 62 Ohio St.3d 507, 510. A party seeking a permanent injunction must show by clear and convincing evidence that the injunction is necessary to prevent irreparable harm and that the party does not have an adequate remedy at law. Procter Gamble Co. v. Stoneham (2000), 140 Ohio App.3d 260, 267-68. The grant or denial of an injunction is solely within the trial court's discretion; accordingly, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion. Perkins v. Quaker City (1956), 165 Ohio St. 120, 125. An abuse of discretion is more than an error *Page 16 
of law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 57} Further, we note that in reviewing factual findings of a trial court, the standard of review an appellate court must apply is manifest weight of the evidence. The judgment of a trial court should not be overturned as being against the weight of the evidence if some competent and credible evidence supports that judgment. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, 280. Factual findings of the trial court are deferred to because the trial court is in a better position "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 58} We begin our analysis with a brief discussion of nuisance law. An absolute nuisance, or nuisance per se, is based on intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what precautions are taken.State ex rel. R.T.G., Inc. v. State, 98 Ohio St.3d 1, 2002-Ohio-6716, ¶ 59. A qualified nuisance is defined as essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm. Id. Strict liability is imposed upon an absolute nuisance finding.State ex rel. Schoener v. Hamilton Cty. Bd. Of Commrs. (1992),84 Ohio App.3d 794, 799.
 {¶ 59} In appellants' second, third, and fourth assignments of error they contend that the trial court abused its discretion and denied appellants' due process of law when it *Page 17 
granted an overly broad injunction. Specifically, appellants contend that the court's order that appellants remove all livestock and the destruction of "valuable buildings and improvements" exceeded the scope of "merely redressing the few proven complaints of the appellees."
 {¶ 60} In addition to the court's discretion in ordering an injunction, the court also retains broad discretion in fashioning the terms of an injunction. Restivo v. Fifth Third Bank of NorthwesternOhio, N.A. (1996), 113 Ohio App.3d 516, 520, citing Superior Sav. Assn.v. Cleveland Council of Unemp. Workers (1986), 27 Ohio App.3d 344, 346.
 {¶ 61} In the present case, we cannot say that the trial court abused its discretion when it enjoined appellants from maintaining cows or pigs on their property and ordered appellants to return their property to its condition immediately prior to the installation of the pig sty. There was testimony presented demonstrating that Wiza had received several complaints about the cows as well as the pigs. There was also ample testimony presented to demonstrate that appellants intended to create the nuisance.
 {¶ 62} In conjunction with appellants' due process argument, in appellants' fifth assignment of error they contend that the trial court engaged in "judicial rezoning" by prohibiting appellants from maintaining livestock in an area where agriculture is a permitted use. What appellants fail to argue is how the fact that appellants were in technical compliance with the zoning resolution, translates into immunity from a nuisance action. *Page 18 
 {¶ 63} The Ohio Revised Code has two statutory sections which provide immunity from a nuisance action with regard to agricultural activities. R.C. 929.04 provides that agricultural activities in an agricultural district are immune from nuisance action. Further, R.C. 3767.13
provides, in relevant part:
 {¶ 64} "(A) No person shall erect, continue, use, or maintain a building, structure, or place for the exercise of a trade, employment, or business, or for the keeping or feeding of an animal which, by occasioning noxious exhalations or noisome or offensive smells, becomes injurious to the health, comfort, or property of individuals or of the public.
 {¶ 65} "(B) No person shall cause or allow offal, filth, or noisome substances to be collected or remain in any place to the damage or prejudice of others or of the public.
 {¶ 66} "* * *.
 {¶ 67} "(D) Persons who are engaged in agriculture-related activities, as `agriculture' is defined in section 519.01 of the Revised Code, and who are conducting those activities outside a municipal corporation, in accordance with generally accepted agricultural practices, and in such a manner so as not to have a substantial, adverse effect on the public health, safety, or welfare are exempt from divisions (A) and (B) of this section, from any similar ordinances, resolutions, rules, or other enactments of a state agency or political subdivision, and from any ordinances, resolutions, rules, or other enactments of a state agency or political subdivision that prohibit excessive noise." *Page 19 
 {¶ 68} We first note that appellants have not registered their land as an agricultural district; thus, R.C. 929.04 is inapplicable. Regarding R.C. Chapter 3767, appellees are not governmental officials and have not commenced this action under this statutory section. Appellees have proceeded under the common-law tort theory of a private nuisance. SeeWinkelmann v. Cekada (1999), 137 Ohio App.3d 176. Accordingly, we find that the trial court did not act to "judicially rezone" the Wiza property; rather, under a common-law nuisance theory he concluded that appellants had maintained a nuisance on the property.
 {¶ 69} Based on the foregoing, we find that the trial court's judgment is not against the manifest weight of the evidence. Appellants' Assignments of Error Nos. One through Five are not well-taken.
 {¶ 70} In appellants' sixth assignment of error, they contend that the trial court improperly used his observations during a judicial view of the property as evidence. In support, appellants rely on Columbus v.Carter (1943), 71 Ohio App. 263. In Carter, following a bench trial, the judge went to the hospital room where a patient claimed to have witnessed an auto accident at the intersection below. Id. at 269. The court then concluded that "`from my observation it would be a very difficult angle to see down to the street-the street light can be seen from there, but it is very difficult to see it.'" Id. The court then determined that the witness must have been mistaken and discounted his testimony. Id. *Page 20 
 {¶ 71} In the present case, in the January 19, 2007 judgment entry the court stated:
 {¶ 72} "The judge, with the permission of counsel and accompanied by them, visited the scene of the `pig farm' and was shocked by the conditions that this nuisance created. The stench was sufficient to take one's breath away and burn the nostrils. While there, I considered breathing through my mouth rather than through my nose, but came down on the side of caution and continued breathing through my nose as I realized it might actually taste worse than it smelled."
 {¶ 73} Upon review, we find that the court provided detailed findings of fact derived solely from the testimony presented at trial. While the court's comments may have been unwarranted, they were consistent with the testimony presented at trial and, in any event, they were harmless. Appellants' sixth assignment of error is not well-taken.
 {¶ 74} In appellants' seventh and final assignment of error they argue that the trial court abused its discretion when it relied on scientific reports referenced by appellees' expert, Michael Brugger, but not admitted into evidence. Appellees contend that the reports referenced by Brugger were, in fact, authenticated and admitted into evidence at trial.
 {¶ 75} Upon review we find that the trial court did not abuse its discretion when it overruled appellants' objection and allowed the testimony. It appears that what appellants are contesting is Brugger's interpretation of the ATEL test reports which were, in fact, admitted into evidence. Accordingly, we find that appellants' seventh assignment of error is not well-taken. *Page 21 
 {¶ 76} On consideration whereof, we find that substantial justice was done the parties complaining and the judgment of the Ottawa County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Mark L. Pietrykowski, P.J., Arlene Singer, J., William J. Skow, J., CONCUR.
[1] For ease of discussion we will refer to appellants' assignments of error numerically. *Page 1