OPINION
{¶ 1} In this consolidated appeal, plaintiff-appellant, National Lime Stone Company (hereinafter referred to as "National"), appeals the order of summary judgment entered by the Common Pleas Court of Hardin County in favor of defendants-appellees, Blanchard Township and William Allen.
 {¶ 2} On March 8, 2000, National Lime Stone Company purchased approximately 235 acres of real property ("the Property") located in Blanchard Township, Hardin County, Ohio.[1] Blanchard Township is a political subdivision of Hardin County and is governed by a Board of Township Trustees ("the Trustees").
 {¶ 3} Although the Property had historically been used only as farm land, National's sole stated purpose for acquiring the Property was to convert the site into a limestone quarry. To accomplish this objective, National would need to make significant capital investments to develop the site. In addition, in order to lawfully engage in the strip-mining of limestone from the Property, National would have to obtain several required permits from various state agencies.[2] Up to and including the date on which National acquired the Property, Blanchard Township did not have any zoning regulations in force. Thus, at the time National acquired the Property, use of the Property was not restricted by any Township land use ordinance.[3]
 {¶ 4} Approximately four months after National purchased the Property, the Trustees of Blanchard Township adopted a "Zoning Resolution" on July 18, 2000. A majority of Blanchard Township voters approved the Zoning Resolution at a township-wide election on November 14, 2000. The Zoning Resolution went into effect on November 21, 2000. As a result, the area in which the Property is located became an "agricultural district" for zoning purposes. This type of district limits use of the land within the district to mainly agricultural or residential purposes. Resultantly, the applicable zoning prohibited National from developing the Property into a limestone quarry.
 {¶ 5} There is no dispute that National was not engaged in actual quarrying operations when the Zoning Resolution went into effect. Rather, the dispute centers on the legal effect of the actions taken by National toward establishing a limestone quarry on the Property prior to the effective date of the Zoning Resolution.
 {¶ 6} National continued its efforts to establish a quarry after the Zoning Resolution became effective. In response to National's continued activity on the Property, an inspector from the Township served National with a "stop violation order" on December 5, 2000.
 {¶ 7} National complied with the Township's order, but it filed a civil complaint against Blanchard Township in the Common Pleas Court of Hancock County seeking declaratory and injunctive relief from enforcement of the Zoning Resolution and asking for money damages. National later amended its complaint and requested the trial court issue preliminary and permanent injunctions to prohibit enforcement of the Zoning Resolution and to declare the Zoning Resolution unconstitutional, void and unenforceable. Alternatively, National requested a declaration from the trial court that National acquired a vested right to use the Property as a limestone quarry even if the Zoning Regulation is otherwise enforceable.
 {¶ 8} In response to National's complaint, Blanchard Township and William Allen, who is an owner of residential property located adjacent to the Property, filed counterclaims against National asking the court to enforce the Zoning Resolution and, further, to permanently enjoin National from establishing a limestone quarry on the Property.
 {¶ 9} All three parties (National, Blanchard Township, and William Allen), filed opposing motions for summary judgment. The trial court held a hearing on the parties' motions for summary judgment on December 9, 2003. The trial court issued its "opinion and findings" on February 9, 2004, wherein it found that the Zoning Resolution was valid and enforceable, that National had failed to establish it had acquired either a valid "nonconforming use" of the Property, or a "vested right" to engage in future quarrying operations on the Property prior to enactment of the Zoning Resolution, and that National was required to comply with the use restrictions of the Zoning Resolution.
 {¶ 10} The trial court, therefore, denied National's motion for summary judgment, granted summary judgment in favor of both Blanchard Township and William Allen, and permanently enjoined National from establishing a limestone quarry on the property.
 {¶ 11} It is from this judgment which National now appeals and raises five assignments of error for our review.
 {¶ 12} An appellate court reviews a trial court's order of summary judgment de novo. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129.
Summary judgment is appropriate if (1) no genuine issue of any materialfact remains, (2) the moving party is entitled to judgment as a matter oflaw, and (3) it appears from the evidence that reasonable minds can cameto but one conclusion, and construing the evidence most strongly in favorof the nonmoving party, that conclusion is adverse to the party againstwhom the motion for summary judgment is made. State ex rel. Duncan v.Mentor City Council (2005), 105 Ohio St.3d 372, at ¶ 9, citing Templev. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 13} To facilitate our analysis, National's assignments of error will be addressed out of the order presented by the appellant.
 ASSIGNMENT OF ERROR NO. III The lower court erred in finding that the Blanchard Township ZoningResolution is valid even though it fails to comply with the townshipzoning enabling statutes, R.C. 519 et. Seq., in the following ways: a)the purpose for the Zoning Resolution espoused by the Township, topromote the general welfare, is outside the authority granted to townshipsunder R.C. 519.02 as a matter of law; b) the Zoning Resolution fails toallow for the completion or extension of non-conforming uses as comparedto non-conforming buildings, where R.C. 519.19 requires such completionand/or extension.
 {¶ 14} "The authority of townships to enact zoning Regulations is neither inherent nor derived from constitutional provision; instead, the Ohio Legislature, pursuant to R.C. Chapter 519, grants townships the authority, as a police power, to adopt and enforce zoning regulations."State v. Crawford, 3d Dist. No. 1-01-150-152, 2002-Ohio-2709, ¶ 22, citations omitted. As such, the zoning authority of townships in the state of Ohio is limited to authority specifically conferred by the General Assembly. Id.
 {¶ 15} Pursuant to R.C. 519.02, a township may adopt comprehensive plans which regulate land use in the unincorporated territories of the township "[f]or the purpose of promoting the public health, safety, andmorals." See R.C. 519.02, emphasis added. National asserts that the Blanchard Township Zoning Regulation is void and unenforceable because the "purpose" for which it was enacted, i.e., for the general welfare of the Township, is outside of the scope of R.C. 519.02.[4]
 {¶ 16} In order to determine the merits of this argument, we refer to the text of the Blanchard Township Zoning Regulation.
 {¶ 17} Chapter 1, Section A of the Zoning Resolution contains the "Title and Preamble," which, in pertinent part, provides:
[w]hereas, it is determined by the * * * Trustees of Blanchard Townshipthat is [sic] in the interest of the public health public safety andgeneral welfare of the township to regulate * * * land for business andindustry, * * * to divide Blanchard Township into zoning districts * **. Emphasis added.
 {¶ 18} In addition Chapter 1, Section D, entitled "Interpretation and Purposes," provides that:
In interpreting and applying the provisions of this Resolution, theyshall be held to be the minimum requirements adopted for the promotion ofthe public health, public safety, and general welfare.
 {¶ 19} The Zoning Resolution clearly contains a purpose that is not provided for by R.C. 519.02, i.e., to promote the "general welfare" of the Township. Although the stated purpose of the Zoning Regulation is overly broad, the inclusion of the term "general welfare" does not, however, result in the Zoning Resolution being rendered void. See generally,Wagner v. Miami Cty. Bd. of Zoning Appeals, 2d Dist. No. 04CA20, 2005-Ohio-1377, ¶ 31. Rather, even if the term "general welfare" is entirely stricken from the Zoning Regulation, the two remaining purposes contained in the preamble to the Zoning Resolution, i.e., for the promotion of public health or safety, are valid purposes under R.C. 519.02
and sufficient to substantiate a township's land use regulation or ordinance. Thus, National's first argument is without merit.
 {¶ 20} National next asserts the Zoning Regulation is contrary to R.C. 519.19 and void because it does not provide for the "completion of non-conforming uses." We disagree.
 {¶ 21} R.C. 519.19 provides that:
The lawful use of * * * any land or premises, as existing and lawful atthe time of enactment of a zoning resolution or amendment thereto, may becontinued, although such use does not conform with such resolution oramendment * * *. The board of township trustees shall provide in anyzoning resolution for the completion, restoration, reconstruction,extension, or substitution of nonconforming uses upon such reasonableterms as are set forth in the zoning resolution. Emphasis added.
 {¶ 22} Chapter 1, Section C(4) of the Zoning Regulation provides in pertinent part:
* * * any preexisting use * * * that is existing at the time of theResolution may be continued, even though such use, * * * does notconform with the provisions of the District in which it is located.
 {¶ 23} In addition, Chapter 4, Section F(3)(a) of the Zoning Regulation provides, in part, that:
Nonconformities: Buildings, Uses and lots: * * * It is the intent ofthis Resolution to permit these non-conformities to continue until theyare removed, but not to encourage their survival.
 {¶ 24} Although the Zoning Resolution does not expressly provide for the "completion" of non-conforming uses, as argued by National herein, it does provide for a "continuation" of such nonconforming uses. We hold that this language conforms to the statutory language of R.C. 519.19, which mandates the township trustees to provide for the extension of a "nonconforming use," and we find the Zoning Resolution is in substantial compliance with R.C. 519.19.
 {¶ 25} Based on the foregoing, we do not find the Blanchard Township Zoning Resolution to be contrary to R.C. 519.19, and, consequently, we overrule National's third assignment of error.
 ASSIGNMENT OF ERROR NO. I The lower court erred in holding as a matter of law that National Limeand Stone Company's ("National") activities and expenditures inestablishing a limestone surface mine at its real property in BlanchardTownship were not enough to establish a vested right to commencequarrying operations and thus failed to establish a non-conforming use.
 {¶ 26} After considering all of the evidence, including the entire list of measures and actions National claims to have made prior to the effective date of the Zoning Resolution toward establishing a limestone quarry on the Property, the trial court found that National neither established a valid nonconforming use of the Property nor acquired avested right to commence quarrying operations which would take National's intended use outside the scope of the Zoning Resolution. Based upon these findings, the trial court permanently enjoined National from establishing a limestone quarry on the Property.
 {¶ 27} "A nonconforming use of land is a use that was lawful before the enactment of a zoning amendment, but one which, although no longer valid under the current zoning rules, may be lawfully continued." Woosterv. Entertainment One, Inc., 158 Ohio App.3d 161, 181-182, ¶ 45, citing C.D.S., Inc. v. Gates Mills (1986), 26 Ohio St.3d 166, 168. In order "`[t]o prevail on a claim for nonconforming use, the landowner must prove by a preponderance of the evidence that: [(1)] the use existed on the effective date of the zoning change, and [(2)] that the use waslegal at that time.'" Emphasis added. Loy v. Liberty Twp. Bd. ofTrustees, 3d Dist. No. 5-02-60, 2004-Ohio-1391, citation omitted; see also R.C. 519.19.
 {¶ 28} As applied to the case before us, National could not have established a valid nonconforming use because: (1) prior to November 21, 2000, National had yet to carry out any actual strip mining operations on the Property[5] and, (2) given that National had not acquired all of the necessary state-issued permits to lawfully engage in surface mining prior to November 21, 2001, any actual quarrying operations would have been unlawful.[6]
 {¶ 29} However, National does not dispute the trial court's finding that it failed to establish a nonconforming use of the Property prior to the effective date of the Zoning Resolution. Rather, National maintains that the evidence before the trial court proves that it acquired a vestedright to complete development of the site and, upon its completion, to commence quarrying operations.
 {¶ 30} As stated supra, R.C. 519.19 provides in pertinent part that the lawful use of real property, "as existing and lawful at the time of enactment of a zoning resolution or amendment thereto, may be continued, although such use does not conform with such resolution or amendment." However, unlike R.C. 519.19, Ohio courts have interpreted the constitutional protections offered by the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution[7] to allow a person to have a vested right to the future use of real-property even though the contemplated use was not possible at the time of the effective date of a zoning resolution. See Jackson Twp.Bd. of Trustees v. Donrey Outdoor Advertising Co. (September 21, 1999), 10th Dist. No. 98AP-1326. "The Ohio Supreme Court, however, has placed limitations on what can be considered a `vested right.'" Id.
 {¶ 31} The first such limitation was pronounced by the Supreme Court of Ohio in Smith et al. v. Juillerat, et al. (1954), 161 Ohio St. 424, wherein the Court stated that:
[w]here no substantial nonconforming use is made of property, eventhough such use is contemplated and money is expended in preliminary workto that end, a property owner acquires no vested right to such use and isdeprived of none by the operation of a valid zoning ordinance denying theright to proceed with his intended use of the property.
Emphasis added, Juillerat, 161 Ohio St. at paragraph four of the syllabus.
 {¶ 32} Thus, when applied to the case sub judice, it is evident that because National had not established a nonconforming use, let alone asubstantial nonconforming use, prior to the effective date of the Zoning Resolution herein, National cannot prevail upon this basis.[8]
 {¶ 33} However, National asserts that Juillerat is not controlling in this matter. Rather, National maintains that although the limestone quarry was not in actual existence and operational prior to November 21, 2000, it, nevertheless, acquired a vested right to complete the establishment of the quarry and to then commence quarrying of the Property because it incurred substantial expenditures, significant obligations, and changed its position prior to the effective date of the Zoning Resolution in order to develop the site into a fully operational limestone quarry.
 {¶ 34} National's contention in this regard stems from the Supreme Court of Ohio's decision in Torok v. Jones, (1983) 5 Ohio St.3d 31, and its progeny. In Torok, 5 Ohio St.3d at 33-34, the Supreme Court of Ohio held:
 * * * a property owner fails to acquire a vested right to completeconstruction and fails to establish a nonconforming use under a townshipzoning resolution where there has been no substantial change ofposition, or expenditures, or no significant incurrence of obligations inreliance upon the zoning permit.
 {¶ 35} The crux of National's contention is the fact that, prior to enactment of the Zoning Resolution, it had expended $698,147.00 for "acquisition and preparation" of the Property. National, therefore, maintains that because it had made substantial expenditures it met its burden of proof to establish that it acquired a vested right. We disagree.
 {¶ 36} In regard to National's financial investment in the Property, the trial court concluded that "* * * while a respectable amount of money has been spent, in light of the total project, it has not been "substantial" in the sense used by the Supreme Court of Ohio * * *."[9]
We concur with the trial court in this regard. The evidence indicates that $480,000 of the $698,147.00 National claims to have invested toward the "acquisition and preparation" of the Property, was for the purchase price of the Property itself, which was obtained at agricultural prices, with little apparent consideration exchanged for the value of any mineral rights. The monetary value of National's investment is only one of many factors to be considered, and, on its own, is not conclusive of whether National acquired a vested right to a nonconforming use of the Property.
 {¶ 37} In furtherance of its argument herein, National sets forth several cases in which the landowners therein had effectively proven that they had "substantially changed" their position so as to merit a finding that they had acquired a vested right to continue a nonconforming use of their property. We, however, find each of the cases cited by National are distinguishable from the case sub judice,[10] and conclude that the evidence does not support National's assertion that it obtained a vestedright to complete and commence quarrying of the Property.
 {¶ 38} In particular, in terms of the entirety of the project being undertaken by National, we find that its development of the site was largely rudimentary and preparatory at best.[11] In addition, we note that although National had acquired a Surface Mine Permit prior to enactment of the Zoning Resolution, several other permits required for the lawful operation of a limestone quarry were not acquired by National until January 31, 2003. In fact, National did not even apply for two of these required permits until January 2, 2001, well after the effective date of the Zoning Resolution. Thus, National's use of the Property as a limestone quarry could not have legally commenced until more than two years following the effective date of the Zoning Resolution.
 {¶ 39} Based upon the foregoing, appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. II The lower court erred as a matter of law when it determined that theapplication of the Zoning Resolution to National's real property did notoperate as a regulatory taking of its property where it specificallyfailed to follow the Ohio Supreme Court precedent of State ex rel.R.T.G. v. State (2002), 98 Ohio St.3d 1, to consider the mineral rightsas a separate property interest in analyzing whether the regulationdeprived all economically beneficial use of the mineral rights in theland.
 {¶ 40} In its second assignment of error, National maintains that the trial court erred as a matter of law by making a general finding that the Zoning Resolution was "not violative of the United States or Ohio Constitution in any claimed particular and is a valid land use regulation." Specifically, National contends that the trial court failed to apply the binding precedent of State ex rel. R.T.G. Inc. v. State,98 Ohio St.3d 1, 2002-Ohio-6716, which requires mineral rights to be analyzed as a separate property interest. National argues that the Zoning Resolution resulted in a taking of those rights and that the trial court should have granted its motion for summary judgment on that basis.
 {¶ 41} Both the United States and Ohio Constitutions guarantee that private property shall not be taken for public use without just compensation. Fifth and Fourteenth Amendments to the United States Constitution; Section 19, Article I, Ohio Constitution. The United States Supreme Court has consistently held that the application of land-use regulations to a particular piece of property is a taking only if either the regulation is constitutionally invalid in that it does not substantially advance legitimate state interests or if it denies an owner economically viable use of his land. State ex rel. Shemo v. MayfieldHts., 95 Ohio St.3d 59, 63, 2002-Ohio-1627, citing United States v.Riverside Bayview Homes, Inc. (1985), 474 U.S. 121, 126, citations omitted. The Ohio Supreme Court has adopted this test for determining whether a zoning law results in a taking that must be compensated.Shemo, 95 Ohio St.3d at 63, citing Goldberg Cos., Inc. v. Richmond Hts.City Council (1998), 81 Ohio St.3d 207, 211, citation omitted.
 {¶ 42} Regarding the constitutionality of the Zoning Resolution, it is axiomatic that "[z]oning regulations are presumably valid and constitutional." Zeltig Land Development Corp. v. Bainbridge Twp. Bd. ofTrustees (1991), 75 Ohio App.3d 302, 306. However, a zoning ordinance may be invalidated on constitutional grounds if the party attacking the regulation establishes its unconstitutionality beyond fair debate.Gerijo, Inc. v. Fairfield, 70 Ohio St.3d 223, 1994-Ohio-432 at syllabus.
 {¶ 43} The trial court herein found that the regulation was "a constitutional, lawful legislative enactment to regulate land usage in Blanchard Township, Hardin County, Ohio." In the present case, National does not attempt to challenge the trial court's finding on the basis that the resolution fails to advance legitimate state interests. It asserts only that the resolution has deprived the Property of all economic viability.
 {¶ 44} To determine the extent to which the Zoning Resolution has deprived land of economic viability, we must compare the value of the property that has been taken by the regulation against the value of the property that remains. Keystone Bituminous Coal Assn. v. DeBenedictis
(1987), 480 U.S. 470, 497. If, in doing so, the regulation has deprived the property of all economic value, a compensable taking results, unless the regulation prevents a use that creates a nuisance. See Lucas v. SouthCarolina Coastal Council (1992), 505 U.S. 1003.
 {¶ 45} The Ohio Supreme Court recently examined the law of regulatory takings in State ex rel. R.T.G., Inc. v. State, 98 Ohio St.3d 1,2002-Ohio-6716, ¶ 38-39. In that case, RTG, a coal mining company, began investigating land in Guernsey County to determine its viability for surface-mining coal in the early 1980s. Id. RTG conducted extensive test drilling, expending more than $250,000 to test-drill, to prepare the mine permit applications, and to acquire property rights to the subject property. Id. Following this preparation, RTG was ultimately issued a permit to mine in 1986. Id. at ¶ 6. Approximately eight years later and after lengthy administrative proceedings, the Ohio Department of Natural Resources determined that RTG's surface mining could adversely affect an aquifer that supplied water to a nearby city and designated the majority of RTG's property "unsuitable for mining." Id. at ¶ 13. RTG subsequently filed a complaint seeking a writ of mandamus to compel appropriation proceedings alleging that the state's action had resulted in a taking of RTG's property. Id.
 {¶ 46} After reviewing the evidence of RTG's involvement with the property, the Ohio Supreme Court determined that the state's "unsuitable for mining" distinction resulted in a categorical taking of all of RTG's coal rights. Id. The court premised this holding on the basis that RTG had a separate property interest in the coal on its property because, pursuant to state law, mineral rights are "severable and of value in their own right." Id. Therefore, the state's action deprived RTG the right to continue to mine the coal, which had been RTG's sole motivation for purchasing the land and, thus, deprived RTG's coal rights of all economic value. Id. at ¶ 49-50, 57.
 {¶ 47} National maintains that, pursuant to R.T.G., mineral rights are to be considered as separate property interest when "the owner's intent was to purchase the property solely for the purpose of mining." National asserts that because the Zoning Resolution wholly denies it the right to quarry limestone, the resolution has deprived National of its mineral rights, and, therefore, all economic value of the Property and must be considered a taking. Conversely, Blanchard Township argues that National is not entitled to the "most advantageous economic use of the property," and the fact that the Property would be more valuable if used for mineral extraction purposes, in itself, is insufficient to establish a taking. For the following reasons, however, we conclude that the facts upon whichR.T.G. was decided do not exist in the present case, and R.T.G. is, therefore, not controlling authority.
 {¶ 48} Under the holding in R.T.G., the intent of a purchaser as to the use of land is a determinative factor in a takings analysis. Although National herein claims its intent in purchasing the Property was solely for the purpose of mining, the evidence indicates that National purchased the Property before it had even verified that it was a viable site for limestone quarrying. Drilling tests were not conducted until after its purchase. Although National may have intended to quarry the Property, the company could not have been certain that quarrying was feasible at the time of its purchase. Moreover, National had done relatively little construction on the site and was not engaged in actual quarrying when the Zoning Resolution went into effect.
 {¶ 49} These facts are in stark contrast to those presented in R.T.G.
There the coal company, prior to its purchase of property, undertook significant activities to test the land for coal deposits and spent hundreds of thousands of dollars determining the land's viability. In addition, RTG had been successfully mining coal for a number of years before the state's designation of the land as unsuitable. Thus, RTG had done substantially more than National. Also, RTG was actively engaged in mining prior to the alleged taking. National was not.
 {¶ 50} Further, we recognize a distinction between the finding by the Ohio Department of Natural Resources that the property in R.T.G. was "unsuitable for mining" and the Zoning Resolution enacted by Blanchard Township. To alleviate the effects of zoning, a property owner can establish a prior non-conforming use or request a variance.[12] No such "exceptions" can be made to an order of the Ohio Department of Natural Resources, however. Therefore, we find that an order of the Ohio Department of Natural Resources permanently restricts the use of property in a way that zoning does not.
 {¶ 51} Having found R.T.G. not to be controlling in the case sub judice, we must determine the extent to which the Zoning Resolution has deprived the Property of economic viability. Blanchard Township asserts that the Zoning Resolution did not deprive the Property of any economic viability because National had not acquired all of the necessary permits in order to legally quarry the Property at the time when the Resolution was adopted. Because National had not obtained the requisite operating permit, it had not obtained a right to mine, and thus, Blanchard Township argues, the passage of the Resolution did not take away any existing right.
 {¶ 52} We have already concluded herein that National did not have a vested right to quarry the Property. However, even assuming that a vested right existed, we find that the Zoning Resolution at issue herein did not deprive National of all economic value of the Property. The evidence establishes that, prior to National's purchase, the Property and surrounding land were used for agricultural purposes and that beans and wheat had been farmed on the Property for several years. When National purchased the Property, it was purchased by a wholly owned subsidiary known as Farm Partners, Inc. John Kinsler, National's Chief Operating Officer, stated that the purpose of forming Farm Partners, Inc. to acquire land was so the mining company could purchase the land as an unknown entity and pay only a small premium of the farm land prices. Kinsler explained that if the seller of the farm land knew the purchaser was an industry or a mining company, the asking price of the land would be much higher. Accordingly, National's use of Farm Partners, Inc. to purchase the Property resulted in the land being acquired at a rate that was consistent with that of farm land. The evidence further indicates that National rented out part of the Property as farm land throughout 2000 while they engaged in preparation activities on other parts of the Property, and that National has rented out portions of the Property as farm land each year since. Accordingly, we cannot find that the Zoning Resolution, by restricting the property to agricultural use, would deprive National of all of the Property's economic viability since the evidence establishes that National could still derive income from the Property in its agricultural state.
 {¶ 53} Enforcement of Blanchard Township's Zoning Resolution will certainly result in the land having less value to National than it would have with a limestone quarry on it. However, the "mere diminution of market value or interference with the property owner's personal plans and desires relative to his property is insufficient to invalidate a zoning ordinance * * *." Trademark Homes v. Avon Lake Bd. of Zoning Appeals
(1993), 92 Ohio App.3d 214, 218-219, 634 N.E.2d 685. In the case sub judice, we find that National has not been able to demonstrate that the Property has been rendered valueless. The Property still has substantial value, albeit not for the use to which National had planned to put it.
 {¶ 54} For the foregoing reasons, we find that there is no genuine issue of material fact as to whether there was an unconstitutional taking of National's Property. Accordingly, we hold that the trial court did not err in failing to grant National's motion for summary judgment on this issue.
 {¶ 55} National's second assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. IV The lower court erred in failing to grant summary judgment in favor ofNational as to William Allen's claim that National's proposed useconstituted a nuisance where, on the uncontested facts, National isentitled to judgment as a matter of law.
 {¶ 56} In its fourth assignment of error, National contends that the trial court erred in failing to grant summary judgment in its favor as to the issue of nuisance. National claims that William Allen cannot sustain his claim for nuisance, as National is proposing to engage in an activity that is sanctioned by the government and heavily regulated. National asserts that such types of activity can never be considered an absolute nuisance.
 {¶ 57} Considering our disposition of National's first, second and third assignments of error, however, we find this issue to be moot. Because we have concluded that the Blanchard Township Zoning Resolution was valid and enforceable, National is prevented, by law, from operating the quarry. Accordingly, it is unnecessary for William Allen to prove the quarry activity is a nuisance, and we hold that the trial court did not err in failing to grant summary judgment in favor of National.
 {¶ 58} National's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. V The lower court erred in granting injunctive relief prohibitingNational from establishing a limestone quarry in violation of the ZoningResolution where the lower court made findings that National had ceasedits activities at the site when it received the Stop Zoning Violationnotice from the Township Zoning Inspector, there was no factual showingthat National violated or intended to violate the Zoning Resolution orany other law, and there was no finding of special damage to Mr. Allen'sreal property.
 {¶ 59} In its final assignment of error, National maintains that the grant of injunctive relief to William Allen was in error. Specifically, National contends that the trial court did not make the requisite findings that National violated the Stop Zoning Violation order or that Allen suffered special damages to his property as a result. Moreover, National maintains that the evidence establishes that it ceased activity as soon as the Stop Zoning Violation notice and, therefore, it was not in violation of the order. Additionally, National argues that William Allen did not demonstrate special damages and, pursuant to R.C. 519.24, did not have standing for injunctive relief. Therefore, National asserts, the trial court's grant of a permanent injunction against National must be reversed.
 {¶ 60} After review, we must conclude that this assignment of error, like the previous assignment, is moot as a result of our other findings herein. We have concluded that the Blanchard Township Zoning Resolution was valid, that National had not established a prior nonconforming use of the property and that the Zoning Resolution did not result in a taking of National's property rights. Accordingly, any error on the part of the trial court in arriving at its decision to grant injunctive relief is harmless, as the end result was, nonetheless, proper.
 {¶ 61} National's fifth assignment of error is hereby overruled.
 {¶ 62} After a consideration of all the evidence and the arguments that National advances herein, we hold that there is no genuine issue as to any material fact and the trial court properly granted summary judgment in favor of Blanchard Township and William Allen.
 {¶ 63} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 Shaw and Rogers, J.J., concur.
[1] We note that the Property was originally sold to "Farm Partners, LLC," a wholly owned subsidiary of National, on April 28, 1999. The title and ownership of the Property was transferred to National on March 8, 2000.
[2] For example, see R.C. 1514.02, which provides, in part, that: "* * * no operator shall engage in surface mining or conduct a surface mining operation without a surface mining permit * * *."
[3] Although "notice" is not an issue herein, we note that, in April 1999, the Trustees appointed a Commission whose purpose it was to create a "proposed zoning resolution" for Blanchard Township. The Trustees were ultimately presented with the proposed zoning resolution on June 13, 2000.
[4] Although inapplicable to the case sub judice, we note that R.C.519.02 has since been amended by 2004 H 148, effective November 5, 2004, and has been rewritten, to provide, in pertinent part that "[e]xcept as otherwise provided in this section, in the interest of the public health, safety, convenience, comfort, prosperity, or general welfare, the board of township trustees may, in accordance with a comprehensive plan, regulate * * *." Emphasis added.
[5] See Jackson Twp. Bd. of Trustees v. Donrey Outdoor Advertising Co.
(September 21, 1999), 10th Dist. No. 98AP-1326. ("R.C. 519.19 only protects existing uses and not nonexis[tent] future uses.").
[6] For example, see Wooster v. Entertainment One, Inc.,158 Ohio App.3d 161, 181-182; ¶ 53, citing Harris v. FitchvilleTwp. Trustees (N.D.Ohio 2001), 154 F.Supp.2d 1182, 1188, ("* * * while topless dance performances on the property began prior to the ordinance's effective date, a substantial nonconforming use had not been established since the property owners had not obtained the appropriate permits and were in violation of zoning and building code regulations.").
[7] "The Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution recognize a right to continue a given use of real property if such use is already in existence at the time of the enactment of a land use regulation forbidding or restricting the land use in question." Jackson Twp. Bd. of Trustees v.Donrey Outdoor Advertising Co. (September 21, 1999), 10th Dist. No. 98AP-1326, quoting Dublin v. Finkes (1992), 83 Ohio App.3d 687, 690, citation omitted.
[8] For example, See Wooster v. Entertainment One, Inc.,158 Ohio App.3d 161, 181-182, ¶ 61 ([W]hile we do not reach a determination as to whether Erotica actually had the ability to operate a business at that time, we do not see how the ability or intention to operate a store can possibly be sufficient to establish a use, let alone a substantial one; nor does Erotica cite any case law to support this contention. Wooster v. Entertainment One, Inc., 158 Ohio App.3d 161,181-182, ¶ 61.)
[9] The trial court specifically found that "* * * given the nature and magnitude of the operation * * * the expenditures to date have barely scratched the surface." In drawing this conclusion the trial court discounted the purchase price of the Property from its tally of "substantial expenditures" incurred by National prior to enactment of the Resolution. The trial court determined that because the Property continued to have value as agricultural land, which was still being utilized as such by National, the actual amount of expenditures by National was $218,147.00.
[10] For example, in Bd. of Warren Cty. Commissioners v. NextelCommunications (Apr. 26, 1999), Warren App. No. CA98-09-115, the Twelfth District Court of Appeals found that although Nextel had not begun actual construction of a communications tower, it, nonetheless, acquired a vested right to complete construction of the tower because it had engaged in extensive bidding and negotiations in seeking to hire a firm to construct the tower, secured its lease of the property, and had surveyed and prepared the site for construction prior to the changes of the applicable ordinance therein, and, therefore, established a nonconforming use. Similarly, in Jackson Twp. Bd. of Trustees v. Donrey OutdoorAdvertising Co. (September 21, 1999), 10th Dist. No. 98AP1326, the Tenth District Court of Appeals found that even though appellees therein had not completed construction of an advertising billboard, they had acquired the right to complete construction of the billboard and commence advertising because, prior to the change in the applicable ordinance, appellees had acquired the necessary certificates for construction of the billboard, "stubbed-in" the foundation for the billboard, and had been making lease payments for use of the property from January 1, 1986 to October, 1986, prior. In addition, we find Kessler v. Smith (1957),104 Ohio App. 213, to be distinguishable from the case sub judice. The land owner therein had made substantial expenditures toward the overall cost of the project, and had substantially developed the property for use as a trailer park prior to enactment of zoning ordinance. Moreover, the court in Kessler, ultimately based its decision on its finding that the ordinance challenged therein did not bear any substantial relationship to public health, safety, welfare or morals, and therefore was not valid and was unconstitutional.
[11] Evidence regarding National's pre-Zoning Resolution activities revealed that National drilled a series of test borings on the Property to confirm the presence of limestone; established an address for the site; built a 500 square foot "staging area;" drilled one ground monitoring well; obtained electrical service; established an access road approximately 300 feet long and covered it with gravel; placed a concrete culvert curb in the ditch in the right-of-way on the Property; posted several "No Trespassing" signs around the perimeter of the Property; and acquired a Surface Mine Permit.
[12] See Jones v. Petruska (June 14, 1979), 8th Dist. No. 38695, ("[A] variance application and asserting prior non-conforming use status constitute separate causes of action, even though * * * they relate to the same subject matter. Both are distinctly separate methods of obtaining relief from a zoning restriction and require different sets of facts to sustain.").